867 A.2d 1077

**Catherine WILSON, et al.**

v.

**JOHN CRANE, INC., et al.**

**No. 79, Sept. Term, 2004.**

Court of Appeals of Maryland.

Feb. 10, 2005.

---

---

John Amato, IV (Goodman, Meagher & Enoch, LLP, Clifford W. Cuniff, Melvin J. Sykes, on brief), Baltimore, for petitioners.

Thomas P. Bernier (John A. Turlik, Michelle Daugherty Siri, Seal, McCambridge, Singer & Mahoney, Ltd., Baltimore, on brief), Michael A. Pollard (Baker & McKenzie, Chicago, Peter A. Woolson, Deborah L. Robinson, Genevieve G. Marshall, Robinson Woolson, P.A., Baltimore, on brief), for respondents.

Argued before BELL, C.J. RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, J.

This case raises questions relating to the discretion of a trial court when a defendant corporation in asbestos litigation seeks the withdrawal or amendment of admissions that were conclusively established due to that defendant's failure to respond to plaintiffs' request for admissions within the prescribed time frame.

The instant appeal involves a personal injury asbestos case that was tried before a jury in the Circuit Court for Baltimore City, beginning on June 26, 2002.[1] Catherine Wilson, surviving spouse, and other immediate family members (collectively, the "petitioners") brought suit against various defendant corporations involved in asbestos-containing product production and/or installation for injuries allegedly sustained as a result of Paul J. Wilson's exposure for over forty years to asbestos while employed at certain job sites in Maryland. These

---

1. Judge Richard T. Rombro presided over the trial. Judge Rombro currently oversees the asbestos docket in Maryland.

defendant corporations included Garlock, Inc. ("Garlock"), John Crane, Inc. ("Crane") and AC & S, Inc. ("AC & S").[2]

As stated, the case was tried before a jury beginning on June 26, 2002. On July 18, 2002, the jury returned verdicts against Garlock, Crane and AC & S and awarded damages in the amount of $2,775,706.75, jointly and severally. Judgment was entered on July 25, 2002, subject to the filing of post-trial motions. All post-trial motions were denied on September 19, 2002. The Final Judgment Order was ultimately entered on December 19, 2002.

Garlock thereafter appealed the decision of the trial court to the Court of Special Appeals and, on May 25, 2004, in an unreported opinion, the intermediate appellate court vacated the judgment of the trial court,[3] finding that the trial court had committed an abuse of its discretion when it refused, by an Order dated June 24, 2002 (one day before the scheduled start of trial), to grant Garlock's motion for leave to withdraw or amend certain admissions that Garlock was held to have made because of its failure to respond in a timely fashion to a request for admissions made by petitioners. As a result of this holding, the Court of Special Appeals further held that the judgment against Crane should be vacated as well, stating, in regard to the question of "whether the judgment in favor of [petitioners] ought to stand against Crane alone," that "we believe it is fairer to Crane to send the entire Wilson case

---

2. The case at bar was originally part of a consolidated asbestos-litigation case under the title of the lead case, *Francis M. Brockmeyer, et al. v. AC & S, Inc., et al.*

3. The unreported opinion of the Court of Special Appeals also addressed the decision of the Circuit Court for Baltimore City concerning the death of William Perkey from mesothelioma alleged to have been brought about by Perkey's exposure to asbestos at his employment. The "Wilson Case" was addressed in "Part I" of the intermediate appellate court's opinion, while the "Perkey Case" was addressed in "Part II." As the legal issues raised in the appeal to the Court of Special Appeals regarding Wilson and Perkey were disparate, and the intermediate appellate court's holding as it relates to Perkey is not at issue in the case *sub judice,* our decision shall only have effect upon that part of the Court of Special Appeals' opinion concerning the "Wilson Case."

back for retrial" (alteration added). Petitioners thereafter filed a Petition for Writ of Certiorari to this Court. On October 6, 2004, we granted the petition. *Wilson v. John Crane, Inc.,* — Md. —, — A.2d — (2004). Petitioners present three questions for our review:

"1. Does the decision of the Court of Special Appeals, which vacated the judgment against Crane because of 'error' in the trial against Garlock, contravene the prevailing rule of the joint and several liability of joint tortfeasors?

2. Even if the 'fairness' standard announced by the Court of Special Appeals were appropriate, did the decision below apply the standard unfairly and reach an unfair result?

3. Did the Court of Special Appeals err in holding [the trial court's] ruling on Garlock's admissions to be prejudicial abuse, and not a fair exercise, of the trial court's discretion?" [Alterations added.]

We hold that the trial court, in disallowing Garlock leave to withdraw or amend certain admissions deemed to have been conclusively established by default, did not commit an abuse of its discretion. The trial court specifically found that petitioners would suffer prejudice if Garlock was allowed to withdraw or amend its admissions, as Garlock did not bring its motion to withdraw or amend until after discovery was closed and the trial was scheduled to begin within days. We do not find that this determination by the trial court was so untenable as to constitute an abuse of that court's discretion.

Because we hold that the trial court did not commit an abuse of discretion in denying Garlock's motion to withdraw or for amendment of its admissions, thereby reversing the decision of the Court of Special Appeals on that particular issue, there is no need for this Court to address directly the issues raised by petitioners regarding whether the intermediate appellate court erred in vacating the judgment against Crane as a result of its finding that the trial court committed an abuse of its discretion in relation to Garlock's motion to withdraw or

to amend its admissions. As those issues existed only where an abuse of discretion was held to have occurred and we now hold that no such abuse occurred, to address those additional issues would be extraneous and unnecessary.

## Facts

Paul J. Wilson was an electrician employed at several job sites in Maryland for a period extending over forty years. His employment history included, but was not limited to, work at Bethlehem Steel's Key Highway Shipyard, Maryland Shipbuilding and Drydock and Western Electric's telephone parts manufacturing plant in Baltimore. In 1987 Wilson was diagnosed as suffering from asbestosis, a scarring of the lungs that leads to breathing problems and heart failure. As its name suggests, the chronic ailment is caused by the inhalation of asbestos fibers over a period of time. In July 1998, Wilson was diagnosed with malignant mesothelioma[4] after visiting a

---

4. The National Cancer Institute describes malignant mesothelioma as "a rare form of cancer in which malignant cells are found in the sac lining the chest or abdomen. Exposure to airborne asbestos particles increases one's risk of developing malignant mesothelioma." *See* National Cancer Institute at http://www.cancer.gov. Malignant mesothelioma "begins in the tissue that surrounds different organs inside the body. This tissue, called mesothelium, protects organs by making a special fluid that allows the organs to move. For example, this fluid makes it easier for the lungs to move during breathing." *See* American Cancer Society at http://www.cancer.org.

As we noted in *Owens–Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 682 A.2d 1143 (1996), another asbestos-related mesothelioma case:
"The membrane surrounding the lungs is called the viscera pleura, which is made up of mesothelial cells. Malignant pleural mesothelioma is the occurrence of malignant tumors in the pleura. Although mesotheliomas can be benign (rarely) and can occur in other membranes or linings made up of mesothelial cells, such as the pericardium surrounding the heart or the peritoneum surrounding the stomach, the simple term 'mesothelioma' commonly denotes a malignant pleural tumor. *See Stedman's Medical Dictionary*, (26th ed.1995); *Dorland's Illustrated Medical Dictionary*, (28th ed.1994); *The American Medical Association Encyclopedia of Medicine* (Charles B. Clayman, M.D., ed., 1989).

"In 1964, after decades of theorizing and research on what causes mesothelioma, a seminal epidemiological study published in the *Journal of the American Medical Association* essentially confirmed that asbestos is a primary cause. The study of asbestos insulation workers

doctor because of concerns over his loss of appetite and fifty-pound weight loss in a six-month period. Following aggressive treatments to halt the progression of the cancer, treatments that included radiation therapy and the removal of his entire left lung, Wilson eventually succumbed to the disease on November 8, 1998.

On March 2, 2000, petitioners brought suit in the Circuit Court for Baltimore City for personal injuries and wrongful death, naming as defendants numerous corporations that petitioners claimed had been involved in the manufacturing, distribution and/or installation of asbestos-containing products to which Wilson was alleged to have been regularly exposed due to his employment. Respondents Garlock and John Crane were two of these named defendant corporations. The suit alleged that it was Wilson's continuous exposure to asbestos fibers that caused his illness and eventual death from mesothelioma.

When the trial commenced in the circuit court on June 26, 2002, for varying reasons not pertinent to the case at bar, only three of the defendant corporations remained in the case— Garlock, Crane and AC & S. Petitioners' case against these remaining corporations relied primarily upon the testimony of two of Wilson's co-workers at Western Electric, along with expert testimony relating to the presence of asbestos in the corporations' products, the history of asbestos-related diseases

---

showed that, after more than twenty years from the beginning of the study participants' exposure to asbestos, these workers 'sustained grossly excessive mortality from lung cancer, mesothelioma, and gastrointestinal cancer....' Barry I. Castleman, *Asbestos: Medical and Legal Aspects*, (1990), citing I.J. Selikoff, et al., 'Asbestos Exposure and Neoplasia,' 188 *JAMA* 22–26 (1964). An extensive overview of Dr. Selikoff's study appears in ... *ACandS, Inc. v. Godwin*, 340 Md. 334, 363–64, 667 A.2d 116, 130 (1995).

"Asbestos is a fibrous mineral mined in Africa, Italy, and elsewhere, useful for its significant heat resistance qualities. Workers inhale asbestos fibers, which cannot be effectively filtered by the lungs' natural protective mechanisms because they are too small. Exactly how the fibers cause malignancy in the mesothelial cells is not known."

*Owens–Corning*, 343 Md. at 506–07 n. 2, 682 A.2d at 1146 n. 2.

generally and the particular disease history of Wilson. There is little doubt, however, that petitioners' case against Garlock was aided when the trial court allowed certain admissions to be read to the jury that stated that Garlock manufactured asbestos-containing gaskets that were used at both Maryland Shipbuilding and Drydock and Western Electric and that Wilson inhaled the released fibers from these gaskets while he was employed at these places. These admissions were admittedly the result of Garlock not timely answering petitioners' electronically-filed "First Request for Admission of Facts and Genuineness of Documents," [5] which was filed on April 5, 2002,

---

**5.** By order of the Circuit Court for Baltimore City, pleadings and documents involved in asbestos personal injury cases are required to be filed using an electronic filing procedure commonly referred to as "eFiling." The order states, in pertinent part:

**"CASE MANAGEMENT ORDER FOR THE ELECTRONIC FILING OF PLEADINGS, PAPERS AND DOCUMENTS IN ASBESTOS PERSONAL INJURY CASES**

1. *Application of Case Management Order*

 a. The Court hereby orders that all cases in the Baltimore City Personal Injury Asbestos Litigation (hereinafter, "Asbestos Litigation") shall be governed by this Case Management Order (hereinafter, "Order"). All cases in the Asbestos Litigation are assigned to the electronic filing and service project known as and hereinafter referred to as "eFiling" as established by an Agreement between CourtLink Corporation (hereinafter, "CourtLink" or "the Vendor") or any successor system, and the Circuit Court for Baltimore City. Pursuant to an Order of the Court of Appeals of Maryland, all parties to any Asbestos Litigation pending in this court may elect to be a Participant to this project. If such an election is made, that party is ordered to comply with this Order....

 . . .

3. *Operation of Electronic Filing and Service Procedure*

 . . .

 b. *Electronic Filing* Except as provided in Paragraph 3i of this Order, all pleadings, papers, or other documents required to be filed with the Court in connection with the Asbestos Litigation shall be electronically filed and served by all Participants on both Participants and Non–Participants. *Discovery requests and responses shall also be electronically filed and served on Participants and Non–Participants electronically.* Attachments to discovery requests and responses which were created electronically shall be electronically filed and served on Participants and Non–Participants. [Emphasis added.]

These procedures were designed to address mass tort litigation, specifically asbestos litigation. Due to the complexity and scope of asbestos litigation, which cannot be overstated, adherence to these procedures is especially important.

and sent to "each direct defendant and its attorney of record." Garlock claims that its failure to respond to petitioners' requests was an "excusable and inadvertent error." Garlock, however, does not deny or dispute that the requests were filed.[6] As we shall discuss, *infra*, the propriety of the trial court in not allowing Garlock leave to file responses to the requests or to withdraw or amend these specific admissions is the issue at the heart of this appeal.

On July 18, 2002, the jury announced its verdict, finding, by a preponderance of the evidence, that Garlock, Crane and AC & S were liable for their negligence in the "manufacture, sale, supply and/or distribution of [their] asbestos-containing products[ ]" and that "Paul J. Wilson's exposure to the asbestos-containing products manufactured, sold, supplied and/or distributed by the defendants ... was a substantial contributing factor in the development of his mesothelioma" (alteration added). The jury verdict totaled $2,775,706.75 against Garlock, Crane and AC & S, jointly and severally. Because AC & S, on September 16, 2002, filed for Chapter 11 bankruptcy, only Garlock and John Crane remain liable, jointly and severally, for the amount of the jury verdict.[7]

## Discussion

Petitioners contend that the Court of Special Appeals erred when it found that the trial court committed an abuse of its discretion when it denied Garlock leave to file responses or to withdraw or amend certain admissions Garlock was held to have made regarding its culpability in manufacturing and distributing asbestos-containing products, which were alleged to have caused the onset of Wilson's mesothelioma. Petitioners point to specific reasons that they say evidence the fact

---

6. In fact, the record indicates that the request for admissions were served upon Garlock *via* the CourtLink system on April 5, 2002 at 4:56 p.m. This service was effectuated by the use of the "File and Serve" filing option available to CourtLink users.

7. The record indicates that certain *pro tanto* settlements totaling $29,092 have since reduced the original jury award.

that the trial court carefully considered whether to allow Garlock to withdraw or amend these admissions prior to trial. For example, as we shall discuss more thoroughly, *infra*, the trial court had, ten days earlier, on June 11, 2002, heard arguments from two other defendant corporations concerning substantially the same matter, *i.e.*, motions to withdraw or amend virtually identical admissions and had granted, *at that point in time*, the motions, which allowed those parties to withdraw or amend their admissions. Also, the trial court made it unquestionably clear that it was especially concerned with the prospect of granting Garlock's motion on what was essentially the eve of trial, finding that such an allowance at that time would be, in its opinion, "inappropriate." Such considerations, petitioners claim, demonstrate that the trial court's eventual decision not to allow such withdrawal or amendment should not be considered to be an abuse of the trial court's discretion. Maryland Rule 2–424 states, in pertinent part:

> "**Rule 2–424. Admission of facts and genuineness of documents.**
>
> (a) **Request for admission.** A party may serve one or more written requests to any other party for the admission of (1) the genuineness of any relevant documents described in or exhibited with the request, or (2) *the truth of any relevant matters of fact set forth in the request.* ...
>
> (b) **Response.** Each matter of which an admission is requested *shall be deemed admitted* unless, within 30 days after service of the request or within 15 days after the date on which that party's initial pleading or motion is required, whichever is later, the party to whom the request is directed serves a response signed by the party or the party's attorney....
>
> ...
>
> (d) **Effect of admission.** Any matter admitted under this Rule is conclusively established unless the court on motion permits withdrawal or amendment. The court *may permit* withdrawal or amendment if the court finds that it

would assist the presentation of the merits of the action and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits. Any admission made by a party under this Rule is for the purpose of the pending action only and is not an admission for any other purpose, nor may it be used against that party in any other proceeding." [Emphasis added.]

■ This Court has stated that "[t]he primary function of a request for admissions is to avoid the necessity of preparation, and proof at the trial, of matters which either cannot be or are not disputed." *Mullan Contracting Co. v. IBM Corp.*, 220 Md. 248, 260, 151 A.2d 906, 913 (1959). The particular admissions at issue in the case *sub judice*, which were later read to the jury at trial, stated the following:

"9. That [Garlock] manufactured, sold, or distributed an asbestos containing product which was used, installed, or removed on ships under construction, conversion, or repair at Maryland Shipbuilding and Drydock Company at some time from 1963 to 1964.

"11. That [Garlock] manufactured, sold, or distributed an asbestos containing product which was used, installed, or removed at Western Electric's plant on Broening Highway in Baltimore, Maryland at some time from 1965 to 1983.

"13. That the use, installation, or removal of the following described asbestos containing products in the normal course of construction, renovation, or repair causes asbestos fibers to be released into the air.

 a. pipecover
 b. block
 c. cement
 d. cloth
 e. board
 f. marinite
 g. packing
 h. precut gasketing

 i. sheet gasketing

 j. taping compound

 k. plaster

"14. That plaintiff's decedent, Paul J. Wilson, inhaled asbestos fiber released by [Garlock's] asbestos products, while he worked at Maryland Shipbuilding and Drydock at some time from 1963 to 1964.

"16. That plaintiff's decedent, Paul J. Wilson, inhaled asbestos fiber released by [Garlock's] asbestos products, while he worked at Western Electric's plant on Broening Highway in Baltimore, Maryland at some time from 1965 to 1983." [Alterations added.]

Garlock contends that the trial court's inclusion of these admissions in the face of its vehement protests in its "Motion for Leave to File Responses to Plaintiffs' Request for Admissions Out of Time or, in the Alterative, for Withdrawal and Amendment of any Admission Deemed Admitted," greatly benefitted petitioners' case against Garlock and conclusively established facts which Garlock had every intention of disputing. What must be resolved, however, is whether such an action by the trial court, in the circumstances of this particular case, amounted to an abuse of discretion. As we stated in *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 701 A.2d 110 (1997):

"There is an abuse of discretion 'where no reasonable person would take the view adopted by the [trial] court[ ]' . . . or when the court acts 'without reference to any guiding rules or principles.' An abuse of discretion may also be found where the ruling under consideration is 'clearly against the logic and effect of facts and inferences before the court[ ]' . . . or when the ruling is 'violative of fact and logic.'

"Questions within the discretion of the trial court are 'much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred.' In

sum, to be reversed '[t]he decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.' "

*Id.* at 312–13, 701 A.2d at 118–19 (citations omitted); *see also Baltimore Transit Co. v. Mezzanotti,* 227 Md. 8, 13–14, 174 A.2d 768, 771 (1961) (stating that "trial judges, who are primarily called upon to administer [discovery] rules, are vested with a reasonable, sound discretion in applying them, which discretion will not be disturbed in the absence of a showing of its abuse") (alteration added). Thus, an abuse of discretion should only be found in the extraordinary, exceptional, or most egregious case.

 The decision of whether to allow a withdrawal or amendment of an admission is "quintessentially an equitable one, balancing the right to a full trial on the merits, including the presentation of *all* relevant evidence, *with the necessity of justified reliance by parties on pre-trial procedures* and finality as to issues deemed no longer in dispute." *Branch Banking & Trust Co. v. Deutz–Allis Corp.,* 120 F.R.D. 655, 658 (E.D.N.C.1988) (some emphasis added) (discussing analogous federal rule). In the instant case, the trial court was put into the unenviable position of having to decide, only four days before the scheduled start of trial,[8] whether to grant Garlock the opportunity to withdraw or amend its deemed admissions under Rule 2–424(d) irrespective of the fact that Garlock had not responded to petitioners' request for admissions before the thirty-day allotted deadline required by Rule 2–424(b). A suggestion as to the answer of this question is to be found in the plain language of Rule 2–424(d) itself, which states that

---

**8.** Garlock's motion to withdraw or amend was filed on Monday, June 17, 2002. The pre-trial hearing took place on Friday, June 21, 2002. The trial court's order denying Garlock's motion was entered on Monday, June 24, 2002. The trial was scheduled to begin the *very next day,* on Tuesday, June 25, 2002.

The hearing on the motion was held within four business days of its filing. Thereafter, a ruling on the motion was made the next business day. As we have said, that was the day before trial. The trial court moved very expeditiously in resolving the issue.

"[t]he court *may permit* withdrawal or amendment if the court finds that it would assist the presentation of the merits of the action and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits" (emphasis added). That the Rule specifically states that the trial court "may permit" instead of "shall permit" is telling in and of itself, *i.e.*, the power of the trial court in deciding matters relating to whether to allow withdrawal or amendment of admissions is *broad. See Livesay v. Baltimore County*, 384 Md. 1, 16, 862 A.2d 33, 42 (2004) (stating that " '[m]ay' is generally interpreted as permissive, in contrast with 'shall,' which is interpreted as mandatory"). The Rule, therefore, does not require the trial court to allow for withdrawal or amendment if certain circumstances exist. Rather, it *permits* the court to do so if those circumstances exist. In *Donovan v. Carls Drug Co.*, 703 F.2d 650 (2d Cir.1983), the United States Court of Appeals for the Second Circuit, in examining Federal Rule of Civil Procedure 36(b), from which Rule 2–424 is derived, explained a trial court's broad discretion in this regard:

> "Under Rule 36(b), the decision to excuse the defendant from its admissions is in the court's discretion. '[T]he court *may permit* withdrawal [of admissions] when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits.' Thus, the court has the power to make exceptions to the Rule only when (1) the presentation of the merits will be aided *and* (2) no prejudice to the party obtaining the admission will result. *Because the language of the Rule is permissive, the court is not required to make an exception to Rule 36 even if both the merits and prejudice issues cut in favor of the party seeking exception to the rule.*"

*Donovan*, 703 F.2d at 651–52 (citation omitted) (some emphasis added).

As with the federal rule, Maryland Rule 2–424(d) provides that a court should determine whether to allow for withdrawal or amendment of party admissions according to a two-pronged test, of which both parts must be fulfilled before a court "may permit," in its discretion, the sought withdrawal or amendment. First, the trial court is to determine whether the withdrawal or amendment of an admission would "assist the presentation of the merits of the action." Rule 2–424(d). Secondly, the trial court determines whether the withdrawal or amendment would "prejudice that party in maintaining the action or defense on the merits." Rule 2–424(d). The test under Rule 2–424(d) is clearly analogous to that of the federal rule. Therefore, while Rule 2–424(d) establishes two prerequisites to *permitting* withdrawal or amendment of admissions, it says nothing about denying motions to withdraw or to amend admissions. Nevertheless, as we shall explain, even if we analyze whether the trial court's decision was within the boundaries of its broad discretion under the two-pronged test, that court's decision to deny Garlock the opportunity to withdraw or amend its deemed admissions did not amount to an abuse of discretion.

In the case at bar, there is little doubt that the admissions Garlock was held by Rule 2–424 to have made were of importance to the merits of the defense against the claim brought by petitioners, as well as the merits of the claim itself. The admissions, which "conclusively established" that Garlock manufactured certain types of gaskets that contained asbestos and that these asbestos-containing gaskets released asbestos fibers into the air that Wilson breathed at his employment, help create the link by which a jury could find that Wilson's illness, and eventual death, were caused in part by Garlock's products. While petitioners at trial still had the burden of establishing that Garlock's asbestos-containing gaskets were a "substantial contributing factor" to Wilson being stricken with mesothelioma, the admissions certainly cannot be said to have concerned matters "which either cannot be or are not disputed." *Mullan,* 220 Md. at 260, 151 A.2d at 913.

Under Rule 2–424(d), however, the inquiry is not done. As stated, the court must now, having already decided that the withdrawal or amendment of admissions would "assist the presentation of the merits of the action," turn its focus to whether allowing a withdrawal or amendment would prejudice the party seeking the admission. As expected, Garlock claims that no prejudice would have befallen petitioners if such withdrawal or amendment had been allowed, while petitioners claim that prejudice would have occurred if Garlock had been permitted to, in effect, recant its earlier admissions.

We find that the circumstances are such that petitioners would likely have been prejudiced if the trial court had allowed Garlock to withdraw or amend its relevant admissions at the late point in which withdrawal was sought. Petitioners cite specific trial strategies which were scaled back or altogether abandoned due to their lack of necessity after Garlock was held to certain admissions due to its inaction in responding to petitioners' requests for admissions. For example, petitioners state that, because of the admissions, they did not pursue the use of non-plaintiff-specific witnesses of workplace exposure and hazard, witnesses who did not know Wilson personally but would have been able to identify Garlock's asbestos-containing gaskets at Wilson's workplaces.[9] Furthermore, certain testimonial evidence adduced at trial was founded upon Garlock's admissions, *e.g.*, a doctor's expert-witness testimony, acquired *via* video deposition, that Wilson's exposure to Garlock's asbestos-containing gaskets was a "sub-

---

**9.** A similar argument concerning the non-use of non-plaintiff-specific witnesses was proffered by petitioners at the June 11, 2002 motions hearing in order to prevent two other defendant corporations, Hopeman, Inc. and Hampshire, Inc., from being granted the opportunity to withdraw or amend certain admissions. The trial court, however, was not persuaded at that time to deny the motions to withdraw or amendment as to those defendants, but in doing so emphasized that the petitioners would likely not be prejudiced because, in those cases, two weeks remained before trial. When Garlock argued for a similar result as to its motion, however, the trial court could no longer rely on the predicate of its earlier decision—that adequate time remained before trial so as not to prejudice petitioners—and instead found that prejudice would likely result if Garlock's motion was granted.

stantial contributing factor" in his being stricken with meso-thelioma, depended greatly upon Garlock's admissions being "conclusively established" under Rule 2–424. Without the establishment of those admissions, the trial court may very well have refused to allow what would then possibly be an expert opinion lacking an evidentiary foundation.[10]

The trial court's rationale for denying Garlock's motion was clearly based on the court's perceived prejudicial effect that allowing withdrawal or amendment would create for petitioners. At the pre-trial hearing on June 21, 2002, the trial court, subsequent to hearing arguments from both parties as to whether Garlock should be allowed to withdraw or amend its admissions, explained its decision to deny withdrawal or amendment:

"THE COURT: All right. There is a question of *timing* involved.

Obviously when I had the motions of Hopeman[, Inc.] and Hampshire[, Inc.] in front of me, which [ ] were filed promptly upon their learning that they had missed something, I dealt with it. I didn't know I was going to be getting three or four more of them.

---

**10.** Our point here is made even more clear when one takes into account a specific argument that Garlock raised in its appeal to the Court of Special Appeals. One of Garlock's arguments on appeal was that "[t]he trial court erred by refusing to strike plaintiffs' expert Dr. Rudiger Breitenecker's Answer to a hypothetical question which was based on facts not in evidence." Therefore, Garlock has argued throughout the life of this appeal both that (1) the opinion evidence of an expert witness was inadmissible because (without the admissions) the opinion lacked evidentiary foundation and (2) withdrawal or amendment of the admissions would not have prejudiced petitioners. Therefore, Garlock's own competing argument shows that prejudice to petitioners could have been created had the trial court allowed for the withdrawal or amendment of respondent's admissions, *i.e.*, there may have been a lack of evidentiary foundation for the opinions of petitioners' expert witness and it may have been too late in the process to create properly that foundation prior to the date of trial. That, in turn, may have necessitated that petitioners seek a postponement in a very complex trial, where postponement itself may have caused petitioners to be "bumped" further down the busy trial docket.

But I think that the time makes a difference, not the defendant, it doesn't make any difference to me who the defendants are, but the timing is.

*And the closer you get to the trial, the more . . . prejudice there is to the plaintiff.*

. . .

I'm not going to grant—I'm not going to grant either motion. I'm sorry. You are stuck with what you have replied in this case." [Alterations added.] [Emphasis added.]

■■■ We do not find that the trial court's denial of Garlock's motion for withdrawal or amendment of its deemed admissions constituted an abuse of the trial court's discretion. The trial court clearly found a basis for its decision, *i.e.*, that petitioners would be prejudiced by the withdrawal or amendment of Garlock's admissions on the eve of trial. The proximity of the trial date is of considerable concern when undertaking a prejudice analysis in relation to Rule 2–424(d), just as it is under the corresponding federal rule. *Compare Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co.,* 123 F.R.D. 97, 107 (D.Del.1988) (finding that prejudice would occur if the court "were to allow the withdrawal of the admissions less than a month prior to the beginning of the . . . trial. At this late date, plaintiffs do not have the time to begin fresh discovery to establish facts previously admitted") *with Herrin v. Blackman,* 89 F.R.D. 622, 624 (W.D.Tenn.1981) (because "no trial date has been set . . . no real prejudice can have accrued to the plaintiff" and late filing of responses to request for admissions should be allowed); *see also United States v. Golden Acres, Inc.,* 684 F.Supp. 96, 98 (D.Del.1988) (disallowing withdrawal of an admission where "[g]ranting the motion here could well delay trial"); *E.E.O.C. v. Jordan Graphics, Inc.,* 135 F.R.D. 126, 129 (W.D.N.C.1991) (stating that "[t]o permit the admissions to be withdrawn at this late date may require additional discovery and would most likely delay the disposition of this matter. For these reasons, the Court believes that withdrawal of the admissions would prejudice

Defendant, and that therefore, withdrawal of the admission ... is not appropriate").

The proximity of the scheduled trial date and adherence to it is especially important in asbestos litigation, which we have considered a "national crisis." *ACandS, Inc. v. Godwin*, 340 Md. 334, 421, 667 A.2d 116, 158 (1995). The United States Supreme Court has itself raised concerns over the "the elephantine mass of asbestos cases" being brought before the courts, both federal and state. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821, 119 S.Ct. 2295, 2302, 144 L.Ed.2d 715 (1999). Justice Breyer, in his dissent to the majority holding in *Ortiz*, expressed his concern over the nature of asbestos cases, which "on average take almost twice as long as other lawsuits to resolve." *Id.* at 866, 119 S.Ct. at 2324 (Breyer, J., dissenting). In order to lessen the burden visited upon the federal district courts by the multitude of asbestos cases before them, Justice Breyer stated that "I believe our Court should allow a district court full authority to exercise *every bit of discretionary power that the law provides* " in order to expedite resolution of asbestos cases. *Id.* at 868, 119 S.Ct. at 2325 (emphasis added) (Breyer, J., dissenting). Justice Breyer partly based this conclusion on his perception of " 'a disparity of appreciation for the magnitude of the problem,' growing out of the difference between trial courts' 'daily involvement with asbestos litigation' and the appellate courts' 'limited' exposure to such litigation in infrequent appeals." *Id.* at 867, 119 S.Ct. at 2325 (Breyer, J., dissenting) (quoting *Cimino v. Raymark Industries, Inc.*, 751 F.Supp. 649, 651 (E.D.Tex.1990)).

In the 2003 "State of the City Docket" for the Circuit Court for Baltimore City the large number of asbestos case filings is made readily clear. The report states that "[s]ince October 1999 when the Court convened a 'working group' of attorneys from the asbestos bar to tackle the backlog of cases on the 'active' docket, the Court has continued to schedule 150 cases for trial every three weeks. . . . Efforts to eliminate the remaining backlog continue." The annual report further states that "[i]n 2003, an average of one hundred twenty (120) new cases were electronically filed per month."

The Circuit Court for Baltimore City, in an attempt to create a more efficient procedure for asbestos claims, introduced an "inactive docket for asbestos personal injury cases" in 1992. *In re Asbestos Personal Injury and Wrongful Death Asbestos Cases,* File No. 92344501 (Balto. City Cir. Ct. Dec. 9, 1992). The existence of an inactive docket allows for the claims of impaired claimants to be heard more promptly by deferring the claims of unimpaired claimants to an inactive docket until the individual develops an actual impairment. No plaintiff loses a cause of action; once someone becomes sick, his or her claim can proceed. Notwithstanding the use of an inactive docket system, as noted in the 2003 annual report, there still exists a backlog of asbestos cases on the "active docket" in the Circuit Court for Baltimore City.

The overwhelming impact of asbestos litigation was also recently addressed in a law review article, *see* Mark A. Behrens, Victor E. Schwartz & Rochelle M. Tedesco, *Addressing the "Elephantine Mass" of Asbestos Cases: Consolidation Versus Inactive Dockets (Pleural Registries) and Case Management Plans that Defer Claims Filed by the Non–Sick,* 31 PEPP.L.REV. 271 (2003), which stated:

"The number of asbestos cases pending nationwide doubled from 100,000 to more than 200,000 during the 1990s. Ninety thousand new cases were filed in 2001 alone.... The RAND Institute for Civil Justice ('RAND') predicts that the litigation will worsen and that the number of claims yet to be filed could range from 1 to 3 million.

. . .

"To some observers, the primary problem with asbestos litigation is the large number of asbestos claims. In an effort to address the overabundance of asbestos claims on their dockets, some courts have joined the asbestos claims for resolution at trial, either in mass consolidations or in clusters.

. . .

"Former Michigan Supreme Court Chief Justice Conrad L. Mallett, Jr. described the situation facing many judges with heavy asbestos caseloads in testimony before Congress. He observed that trial court judges inundated with asbestos claims might feel compelled to shortcut procedural rules:

'Think about a county circuit judge who has dropped on her 5,000 cases all at the same time.... [I]f she scheduled all 5,000 cases for one week trials, she would not complete her task until the year 2095. The judge's first thought then is, "How do I handle these cases quickly and efficiently?" The judge does not purposely ignore fairness and truth, but the demands of the system require speed and dictate case consolidation even where the rules may not allow joinder.'

. . .

"Both consolidations and innovative docket management plans are driven by a concern about overcrowded dockets....

. . .

"Removing the long delays that are characteristic of many asbestos cases can be especially important to impaired claimants....

. . .

"Courts facing the 'elephantine mass of asbestos cases' recognized by scholars, practitioners, and the Supreme Court of the United States, have approached the task of reducing this unprecedented surge of litigation in two very different ways. Some courts ... have engaged in mass consolidation. Other courts have utilized 'mini-consolidations' ['clusters']. At least theoretically, such procedures expedite resolution of the litigation, but this expediency comes with the price of litigants' fundamental due process rights. The consolidated trial is a blunt instrument. It

does not allow individual claimants to be treated individually; everyone is thrown into the 'courtroom Cuisinart.' ...

"A growing number of courts have decided to take a different path, one that is more surgical in its approach to the asbestos litigation problems of today. These courts have focused on the 'root cause' of the current crisis-mass filings by the unimpaired or only mildly impaired. These filings are largely responsible for the exploding asbestos dockets that many courts are now experiencing. They are also the driving force behind mass trials.

"So far, state courts in states ... [such as] Maryland ... have worked to separate valid asbestos claims from those that are nascent at best, and have given trial priority to people who are sick...."

*Id.* at 273–98 (alterations added) (footnotes omitted). The article had earlier noted the Maryland experience:

"Circuit Court Judge Richard Rombro, who oversees the asbestos litigation in Baltimore, recently remarked on the success of the court's inactive docket plan. Since the docket's establishment in 1992, he said:

'[T]here have been 14,713 cases filed and placed on the inactive docket; in that same period 6,098 cases have been moved to the active docket, and 71 cases which were removed to the Federal Court. The number activated from the inactive docket is over 40 percent which would indicate to this court that the docket is working and that a substantial number of cases have been moved to the active docket while those without any impairment remain on the inactive docket.' ... 'With the number of defendant companies that have declared bankruptcy, it would seem that the resources should be conserved for those who are substantially and demonstrably sick, or who are actually impaired, from exposure to asbestos.' "

*Id.* at 290 (footnotes omitted).

The adverse consequences of continuances on the parties and on the courts has perhaps been best explained by the United States District Court for the District of Maine in

*Stacey v. Bangor Punta Corp.*, 107 F.R.D. 779 (D.Me.1985), a case against gun manufacturers. The defendants in that case had served notice of two of their expert witnesses on the plaintiffs a year before. At the last minute plaintiffs apparently were contending that their subsequent discovery of a theory propounded by the defendants' experts created a need for them to obtain the court's permission to add other expert witnesses for the plaintiffs. Before rendering its decision the court opined: "The Court views the Plaintiff's motion as arising from a significant breach of the Plaintiff's obligation to diligently prepare for trial and to observe the discovery requirements specified in the discovery rules and those imposed by the Court in the particular proceeding." *Id.* at 782. It then noted the case of *Johnson v. H.K. Webster, Inc.*, 775 F.2d 1 (1st Cir.1985), which in turn referred to *Meyers v. Pennypack Woods Home Ownership Ass'n.*, 559 F.2d 894 (3d Cir. 1977), and quoting from those two cases the *Stacey* court stated: "The First Circuit Court of Appeals has just recently stated, concerning the criteria set out in *Meyers*, '[w]e agree with the Third Circuit that the two most important factors to be considered are the prejudice and surprise suffered by the opposing party, and that party's ability to cure the prejudice.' " *Id.* at 782–83 (citation omitted). The *Stacey* court went on to hold:

"This case has now been pending for two years and two months.... The Court has ... specially reserved to this case the eight to ten days of trial time on its docket which counsel estimate that the trial will require. Other cases have been scheduled around the period so committed to this case.

. . .

"To the extent that a continuance of the scheduled trial in this case should become necessary, it would cause a very adverse effect upon the Court's trial calendar through January 1986. At the very least it would require a complete restructuring of the docket over the next two and a half months and require the Court, in order to use the trial time

made available in November for this case, to thrust upon counsel in other cases the burden to speedily prepare their cases for trial after having been assured by the Court that they are not at risk of trial until January 2, 1986.... Finally, if continued, this lengthy case would have to be inserted into the existing January 1986 trial schedule, thereby disrupting it and utilizing time now allocated to trial of other cases for which counsel therein are now preparing.

"Thus a continuance of this case would cause a severe disruption of this Court's established docket for the next several months, occasion significant amounts of unanticipated time and effort by the Court, numerous counsel and others to accommodate to the changed situation, and notably impair the judicial efficiency of this Court. Finally, it would delay by at least several months trial of this case in which many persons have made special efforts to meet the established trial date originally agreed upon, the case being now in a posture to be ready for trial on November 12 but for Plaintiff's latest request to add expert witnesses. The benefit of a significant part of those efforts would be lost by a continuance at this point in time."

*Id.* at 784–85.

At the time Judge Rombro denied Garlock's motion for withdrawal or amendment, the case *sub judice* had been pending for over two years. It is clear that there are numerous asbestos cases pending on the particular docket at issue in this case. Much of what the *Stacey* court noted may be equally applicable in the Maryland asbestos cases and the asbestos docket.

Were the Court to find that the trial judge in this case had abused his discretion in not permitting the "last minute" withdrawal or amendment of admissions, we would be sending a message to all potential defendants in mass tort actions that a lack of diligence, instead of penalizing the party lacking diligence, can become a weapon to create delay and thus penalize the party seeking prompt redress in the courts. The prejudice to an opposing party from such a lack of diligence is

amplified in mass tort cases where there are already built-in periods of extensive delay caused by the very mass of cases in the first instance. If a last minute granting of such withdrawals creates the need for a continuance for the opposing party in order for it to adjust its trial strategies to the new defenses arising from a withdrawal of admissions, that party is faced with a Hobson's Choice [11]—either continue with the regularly scheduled trial date and try to overcome the last minute hurdle placed in his way by the withdrawal of admissions including the adjustment of witnesses (either addition or deletion of expert witnesses, etc.) and the like, or request a continuance and lose the party's place in the litigation lineup which may result in further extensive delay in having that particular trial rescheduled. Additionally, even if the trial court were later willing to insert that case into the lineup of cases awaiting trial, absent built in openings in the docket, it would have to wait either for a pending case to settle out (and most cases settle out at the last minute, making it difficult to replace them), or arbitrarily to insert the case into the lineup, pushing back all the cases from the point of the insertion, thereby changing the trial calendars of numerous parties and attorneys.

A key consideration for the trial judges in the mass tort area is their ability to recognize the timing factor when the granting of such a motion to withdraw is likely to prejudice the opposing party by causing that party to be faced with the Hobson's Choice we have described above. If there is sufficient time for the opposing party to adjust its case with a full opportunity for a fair presentation, then it may not be an abuse of discretion to grant such a motion, but, if the contrary exists, *i.e.*, if the motion to withdraw admissions were to be granted and the opposing party in a mass tort be required to seek a continuance in order to be afforded a full opportunity to fairly present the plaintiff's case, then it generally will not be

---

11. The term Hobson's Choice originated from a stable keeper who, when renting horses, gave his customers their choice of the horses from the "one closest to the stable door."

an abuse of discretion for the trial court to deny the motion, leaving the moving party with the prejudice, if any, its own lack of diligence created in the first instance.

Judge Rombro clearly understood the importance of the timing of Garlock's motion to withdrawal or amend in the case *sub judice.* The record reflects that he had both granted such motions and denied them. And he did so based upon the time remaining for the opposing parties to adjust. To him, it was the timing—and he got it right.

With the quantity of cases involving asbestos litigants, the scheduling and maintaining of trial dates is more important, both for the parties to the action and the courts. *See, e.g., Norfolk Southern Railway Co. v. McGraw,* 71 Fed.Appx. 967, 971 (4th Cir.2003) (per curiam) (United States Court of Appeals for the Fourth Circuit finding that "managing the trial court docket so as to handle all of the pending [asbestos] cases without paralyzing the functioning of the court is an important state interest that implicates the state courts' ability to perform their judicial function") (alteration added). Once a trial date is imminent, any occurrence that requires a continuance of a trial date may put a case behind numerous other cases on an already clogged asbestos docket and the delay may be significant.[12] *See Eagle–Picher Indus. v. Balbos,* 84 Md.App. 10, 26, 578 A.2d 228, 235–36 (1990) (Court of Special Appeals stating the "[t]he pre-trial order is the guiding light upon which each party is entitled and encouraged to rely. Its importance, especially in complex and mass tort cases, *cannot*

---

12. The difficult decision with which petitioners would likely have been faced had the trial court granted Garlock's motion to withdraw or amend was considered during oral argument before this Court. Counsel for petitioners opined that the trial court would likely not have allowed for a continuance or delay so that petitioners "could locate additional witnesses" because courts "try to stick to asbestos trial dates very firmly in Baltimore City because they are so precious." On the other hand, if a continuance or delay were allowed, petitioners' counsel suggested that certain witnesses, specifically one who was coming from France, may not have been able to testify at a later time if a continuance was indeed sought. As petitioners' counsel stated, "we would have been torn in a decision as to whether to ask for a trial delay or not."

*be overstated* ") (emphasis added); *see also Stacey v. Bangor Punta Corp., supra* at 784–85 (refusing to grant continuance in products liability action on grounds that rescheduling of eight to ten day trial would produce "very adverse effect" on court's calendar and would require "complete restructuring" of established docket for next two-and-a-half months). Such delay can undoubtedly prejudice a plaintiff in an asbestos case. *See Godwin,* 340 Md. at 422, 667 A.2d at 159 (stating, in an asbestos case, "the maxim has remained constant that, ordinarily, DELAY FAVORS THE DEFENDANT").

Here, the trial was scheduled to begin on June 25, 2002, according to the thoroughly delineated "Consolidation Order and Pre–Trial Schedule." Petitioners' request for admissions had been electronically filed on April 5, 2002. Under Rule 2–424(b) any responses by Garlock to this request were due by May 6, 2002. Garlock did not file its motion to withdraw or amend its deemed admissions until June 17, 2002. The pre-trial hearing, which concerned, *inter alia,* Garlock's motion to withdraw or amend was held on June 21, 2002, *a mere four days* before the scheduled start of the trial. Because the trial court found it likely that prejudice would result if Garlock were to be allowed to withdraw or amend its admissions in that petitioners' reliance on those admissions in developing its case against Garlock would thereafter be negated, we do not find that the trial court abused its discretion in making its judgment to deny Garlock's motion.

The fact that the trial court's decision to deny Garlock's motion to withdraw or amend was based on its reasonable discretion is further elucidated by the fact that, as we noted, *supra,* on June 11, 2002, as the aforementioned pre-trial hearing transcript indicates, the trial court heard arguments concerning similar motions to withdraw or amend deemed admissions[13] from two other corporations involved in the

---

13. The record in this case indicates that both Hopeman and Hampshire filed their motions to withdraw or amend on June 4, 2002, nearly two weeks before Garlock did the same.

asbestos litigation, Hopeman Brothers, Inc. and Hampshire Industries, Inc.,[14] and granted both companies' motions to withdraw or amend those admissions, which, had they not been withdrawn, would have conclusively established that the companies were involved with asbestos-containing products and that Wilson had inhaled asbestos fibers from these products—admissions little different in substance from those of Garlock. *At that time,* two weeks before the scheduled trial, the trial court, in its discretion, found that no unfair prejudice would be visited upon petitioners if the motions for withdrawal or amendment were granted. Ten days later, however, when Garlock was before that same trial court arguing that it too should be allowed to withdraw or amend its deemed admissions, the trial court found the situations to be different. As the trial court indicated, the timing of the filing of Garlock's motion was very different in relation to scheduled trial dates. An application of Rule 2–424 by a trial court, under these circumstances, does not amount to an abuse of that court's discretion.[15]

---

**14.** These two corporations, asbestos installers, were involved in the underlying asbestos litigation because of cross-claims asserted against them by John Crane, Garlock and AC & S. The jury did not find Hopeman and Hampshire liable for Wilson's development of mesothelioma, thereby finding against Garlock and Crane on the cross-claims.

**15.** Indeed, such a strict application of discovery rules may be particularly warranted in cases involving asbestos litigation. As the Court of Special Appeals stated in *Eagle–Picher:*

"[A]sbestos litigation presents features that, unfortunately, are common to complex litigation. Most of the cases are of the multi-litigant variety, averaging as many as twenty defendants. When the multitude of cross-claims between those defendants are factored in, the complex metamorphosizes into the maxi-complex. Thus, it seems quite possible that our dockets shall be visited with asbestos litigation well into the next century, each case presenting its unique yet similar tragic scenario."

*Id.* at 17, 578 A.2d at 231 (footnote omitted).

With strict but reasonable application of the discovery rules courts can attempt to "rein in" any problematic situations, especially those concerning untimely responses to discovery requests, possibly preventing an admittedly complex species of litigation from becoming even more so.

 Moreover, in reaching any decision regarding withdrawal or amendment of admissions in relation to allegedly inadvertent admissions, it is imperative that courts consider whether the party seeking the withdrawal or amendment has acted with due diligence. In more general terms, courts should seek to ascertain whether the aggrieved party was careless in not timely filing its responses to valid requests for admissions. *See Branch Banking,* 120 F.R.D. at 660 (federal district court, in explaining why it declined to permit withdrawal of admission, stating that the record disclosed "no reason why defendants, with due diligence, could not have [timely] denied plaintiff's request ... or, if they were uncertain of how to respond, state the reasons why they could not truthfully admit or deny the matter at that time") (alteration added).

 Garlock was unable to provide the trial court with any legitimate excuse as to why it did not answer petitioners' request for admissions within the temporal confines of Rule 2–424(b). Affidavits were filed by Garlock's counsel that suggested that its failure to respond was due to an oversight by both a paralegal who had the task of monitoring new filings in the eFiling system and the supervising attorney of that paralegal. In its memorandum in support of its motion to withdraw or amend its admissions, Garlock further casts some of the blame on the "blizzard of electronic filings" that the eFiling system has effected. We are not prepared at this time to find that a court has committed an abuse of its broad discretion in denying a party's motion to withdraw or amend its admissions where that party's only excuse as to why it did not timely respond to a request for admissions amounts to a plea that, because the particular attorney or firm has undertaken a large number of clients or cases, he or it cannot adequately control or oversee the proper responses to pleadings. Attorneys are required not to undertake representations unless they can adequately monitor the pleadings. This is no less so in asbestos litigation.

Furthermore, the fact that Garlock, on June 4, 2002, received, through the eFiling system, both Hopeman's and Hampshire's motions to withdraw or amend any request for admissions deemed to have been admitted under Rule 2–424(b), as well as those corporations' late responses to petitioners' request for admissions, should have alerted Garlock that a serious issue may have existed with its own filings or lack thereof. It is very likely that Garlock, if it had recognized its mistake in not filing a response to petitioners' April 5, 2002 request for admissions and thereafter filed a similar motion and response to that of Hopeman and Hampshire, could have participated in the June 11, 2002 motions hearing and not had its earlier admissions be "conclusively established." However, for reasons which we can only attribute to a lack of due diligence, Garlock was oblivious to these additional filings by Hopeman and Hampshire and waited until mere days before the scheduled start of trial to file its own motion to withdraw or amend.

However characterized, Garlock's failure to respond to petitioners' request for admissions was a result of oversight. Therefore, we hold that the trial court did not abuse its discretion when it denied Garlock's motion to withdraw or amend its admissions.

As a matter of procedure, we note that because we hold that the Court of Special Appeals erred in holding that the trial court committed an abuse of its discretion, and the intermediate appellate court did not decide petitioners' remaining issues because of the preclusive nature of that specific holding, we shall remand this case to the Court of Special Appeals for it to decide, as may be necessary, those issues left unaddressed.[16]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AS TO PETITIONER WILSON'S CASE.**

---

**16.** The Court of Special Appeals specifically stated that "[w]e hold that the [trial] court erred in not allowing Garlock to withdraw admissions that were significant to the case. Because we vacate the judgment for that reason, we will not address the other issues raised by the parties." [Alteration added.]

CASE REMANDED TO THAT COURT TO DECIDE THE ISSUES RAISED BY THE PARTIES BUT NOT ADDRESSED BY THE COURT OF SPECIAL APPEALS. COSTS IN THIS COURT TO BE PAID BY RESPONDENTS.