*Shelton Alexander v. Tamara Alexander*, No. 1320, September Term 2020. Opinion by Salmon, James P. (Senior Judge, Specially Assigned).


**<u>CUSTODY AND VISITATION</u>** – Under Maryland Code, Family Law Article § 9-105, the court can deny make-up time to a parent who has unjustifiably been denied visitation access, if the court finds that such a denial is in the best interests of the child.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1320

September Term, 2020

_____

SHELTON ALEXANDER

v.

TAMARA ALEXANDER

_____

Friedman,
Ripken,
Salmon, James P.
　　(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Salmon, J.

_____

Filed: July 28, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Shelton Alexander ("Father") and Tamara Alexander ("Mother") were married in 2004. A son ("S.") was born to the marriage in August of 2006. The marriage was ended on July 28, 2014 when the Circuit Court for Frederick County, Maryland entered a final judgment of divorce. Father appealed from the entry of that judgment, but this Court affirmed it in an unreported opinion. *Alexander v. Alexander*, No. 2189, Sept. Term, 2014 (filed July 16, 2015).

More litigation followed, most of it concerning custody and visitation issues. In 2017, Father moved to modify custody, visitation and child support and in October of that year, Mother filed a counter-motion asking the court to grant her sole legal and primary physical custody of S. An eleven-day merits hearing was held on that matter, which ended on August 8, 2019.

On September 3, 2019, the Circuit Court for Frederick County filed a custody order ("the final custody order") that granted Mother sole legal and primary physical custody of S. Father was granted access to S. every other weekend from after school on Friday until Monday morning, plus every Wednesday evening from 6:30 P.M. to 8:15 P.M., so that S. could attend a church youth group. The court set forth in its order a detailed holiday schedule and granted each party two-week blocks of summer access in July, with the orders of the blocks alternating year-to-year. Father appealed that order, but we affirmed the judgment in another unreported opinion. *Alexander v. Alexander*, No. 1417, September Term, 2019 (filed June 1, 2020).

While the last-mentioned appeal was still pending, Mother, on March 18, 2020, sent Father an email that read:

Given [S.'s] Diabetes and thus his vulnerability to getting serious complications from COVID-19 if he contracts the Coronavirus, I plan on keeping him here at home until the CDC Coronavirus guidelines are lifted and schools are back in session. We can discuss makeup time once it is safe to do so.

During the next few days, several emails between Father and Mother were exchanged. Father took the position that Mother had no right to disobey a court order and that obeying the visitation order would not endanger S.'s health. Mother maintained that because she had been given the authority to make medical decisions for S., she had the right to ensure his safety by halting, temporarily, Father's right to have visitation with his son. Therefore, she announced that Father's weekend visitation with S., scheduled for March 20, 2020, would be canceled as well as future visitation until school reopened. She wrote in an email to Father dated March 19, 2020:

I do agree with you that waiting for school to resume might be an untenable resolution, so I have come up with a creative solution to ensure you and [S.] stay connected, yet we keep him as safe as possible. I will give you extended Facetime/virtual time with him over the weekend for gaming or for you to just spend time with him. This is a good way to put his health first, yet keep you two connected.

I also would like everyone in both households to get tested for the Coronavirus as soon as testing is available for the general public. Right now, they are prioritizing testing for those with symptoms, so I am not sure when testing will become available. However, can we agree that we will all get tested and share the results when testing becomes available?

We can continue to evaluate this situation on a daily basis.

The parties did not resolve their differences and on March 27, 2020, Father filed an "Emergency Motion to Enforce Court's Order Regarding Access During COVID[-]19 Pandemic" ("the emergency motion"). In the emergency motion, Father had two main

2

complaints. The first was that almost immediately after the September 3, 2019 final custody order was docketed, Mother curtailed "Wednesday evening access and extra-curricular activities[.]" Secondly, Father alleged that he was being deprived of his right to visitation because Frederick County public schools and all of Maryland public schools were currently closed until April 24, 2020 because of COVID-19, and Mother had advised him by email that she was "keeping [S.] in [her] house until all restrictions are lifted and the kids are allowed to go back to school." Father also alleged that despite Mother's claims of "health concerns," she had recently traveled to New Orleans for *Mardi Gras* and had been "diagnosed with bronchitis after her return" from that city. Father asked the court to grant his emergency motion and to sign an order: 1) requiring mother to immediately comply with the terms of the final custody order; 2) granting Father extra visitation as "make-up time" for the period that Mother had withheld visitation; and, 3) grant him "attorney's fees."

Mother, by counsel, filed an opposition to Father's emergency motion in which she alleged that she was justified in withholding visitation because of the risk to S.'s health presented by the COVID-19 pandemic. She maintained that "since the public schools were closed after March 13, 2020," "neither [she] nor [S.] ha[d] left their residence and no other individual(s) have entered the residence." She also noted that Maryland Governor Lawrence Hogan, Jr. had, on March 30, 2020, issued an executive order for the safety of all citizens that required, during the COVID-19 pandemic, all "non-essential citizens to remain in their homes beginning on March 30, 2020 at 8:00 P.M. except for the performance of essential activities as further defined by the Order."

3

Mother denied Father's allegation that she had violated the provision of the final custody order concerning Wednesday night access. Lastly, Mother alleged that she had offered Father "day for day make up time" once the pandemic problem abated but Father had rejected that offer.

On April 1, 2020, Father filed a reply to Mother's opposition. He alleged that S.'s type 1 diabetes was well controlled. He also asserted that literature provided by the American Diabetes Association made "it clear that a diabetic is not at a greater risk of having severe complications from COVID-19 than the general population if the diabetes is managed well."

The issues raised in the motion for an emergency order were heard in the Circuit Court for Frederick County on September 10, 2020. The motions judge was the same judge who had conducted the eleven-day hearing that resulted in the September 3, 2019 final custody order.

Father called Mother as an adverse witness and he also testified. Father also called two other witnesses, but their testimony is not relevant to the issues raised in this appeal. At the conclusion of the hearing, the motions judge delivered an oral opinion, which was followed by a written order that was docketed on December 22, 2020. The order read, in material part, as follows:

> ORDERED, that Defendant's [Father's] Emergency Motion to Enforce Court's Order Regarding Access During COVID[-]19 Pandemic be, and the same is hereby DENIED; and it is further,
>
> ORDERED, that on each Friday which begins Defendant's weekend access, while the minor child is in school virtually, the Defendant shall pick up the minor child at 3:30 P.M., and thereafter, when school resumes in the

4

classroom, Defendant shall pick up the minor child after school on the Friday which begins his weekend access, as provided in this [c]ourt's Final Order entered on September 3, 2019; and it is further,

ORDERED, that each party's request for an award of attorney's fees be, and the same is hereby DENIED; and it is further,

ORDERED, that all other provisions of this [c]ourt's Final Order, entered on September 3, 2019, not inconsistent with the provisions of this Order, shall remain in full force and effect.

In this timely appeal, Father, acting *pro se*, raises the following questions:[1]

(1) Did the circuit court err in denying Father make-up time based upon an incorrect legal premise?

(2) Did the motions judge abuse her discretion when she consulted with a magistrate judge prior to announcing her decision that she would not award Father make-up time?

(3) Did the motions judge abuse her discretion in denying the motion to enforce Wednesday-night access, which Mother denied in part for over a year?

(4) Did the circuit court err in modifying the court-ordered access for Father and abuse its discretion in denying the motion to enforce the weekend-access pick-up time afforded Father?

(5) Did the motions judge abuse her discretion in denying attorney fees to Father?

---

[1] In his brief, Father did not list any questions presented. But he did make four arguments that we have converted into questions presented; the arguments were: 1) "The [c]ourt abused its discretion in consulting with a [m]agistrate and denying [a]ppellant make-up time based upon an incorrect legal premise"; 2) "The [c]ourt erred in modifying the court-ordered access for [a]ppellant and abused its discretion in denying the motion to enforce Wednesday-night access, which [a]ppellee denied in part for over a year"; 3) "The [c]ourt erred in modifying the court-ordered access for [a]ppellant and abused its discretion in denying the motion to enforce the weekend-access pick-up time afforded [a]ppellant"; and 4) "The [c]ourt abused its discretion in denying the awarding of attorney fees to [a]ppellant."

5

Mother, *pro se*, filed a brief asking us to affirm the order filed on December 2, 2020.[2]

## I.

### *Background Facts*

Both Father and Mother live in the city of Frederick. Since their divorce, the parties have engaged in almost constant litigation concerning matters of custody and visitation. While they are both very good parents, the trial judge found that the two are incapable of cooperating with one another concerning child rearing issues.

At the time of the hearing, S. was 14 years old and a student at Tuscarora High School in Frederick where he excels academically. In 2018, S. was diagnosed as suffering from type 1 diabetes, which, fortunately, has been kept under good control.

In March of 2020, Mother became concerned that S. would contract the coronavirus. More specifically, she feared that if he did contract that virus, he was more likely than others to have severe medical consequences due to his diabetes. She felt that her fear was substantiated by medical literature that she reviewed. Because of that fear, with one exception, Mother and S. did not leave their house for any reason from March

---

[2] In her brief, Mother recites several "facts" that are unsupported by anything in the record. In his reply brief, Father does the same, although to a lesser extent. In this opinion we have ignored all factual allegations by the parties that are not supported by the record.

18 to May 5, 2020.[3]  During that period, Frederick County public schools were closed due to the COVID-19 pandemic.

As mentioned, on March 18, 2020, Mother informed Father that she was denying him the visitation that he was entitled to under the final custody order.  Under the terms of that order, Father was entitled to have weekend visitation with S. starting on Friday, March 20, 2020 after school until the following Monday at 8:00 A.M.  Father was also entitled to weekend visitation on alternating weekends thereafter.  As a consequence of Mother's actions, Father was also denied access for the 2020 Easter weekend[4] and S.'s Spring break from school that year.

On May 14, 2020, Governor Hogan announced that he was relaxing the shelter in place order that previously was in effect.  Mother notified Father on that date that she would allow S. to resume visitation with Father on Friday, May 15, 2020.  She also told Father at that time that because he had missed 18 days of access to S., she would allow him to have 18 straight days of visitation, i.e., from May 15, 2020 until June 8, 2020.  Father rejected that offer.

At the hearing concerning Father's motion to enforce, counsel for Father attempted to undermine Mother's contention that she withheld access because she feared

---

[3]  The one exception occurred on May 3, 2020.  On that date, S.'s half-sister, who lives with Father, celebrated her first birthday.  On May 3, 2020, Mother drove S. past Father's house with the hope of having S. participate in a "drive-by" celebration of his sister's birthday.  Because the parties did not cooperate, S. did not get to see his sister that day.

[4]  In 2020, Easter Sunday was on April 12, 2020.

for S.'s health. Father's counsel suggested, by his questioning, that Mother had jeopardized S.'s health by going to *Mardi Gras* in New Orleans in 2020 during the pandemic where she caught bronchitis and thereafter, refused to quarantine in Maryland when she returned from Louisiana. Mother testified that she had bronchitis in February 2020, that *Mardi Gras* ended on February 25, 2020 and that she was in New Orleans after the *Mardi Gras* celebration from March 5 to March 9, 2020. She also testified that to her knowledge, no person had contracted coronavirus in New Orleans while she was there.[5]

Mother testified that she cut off Father's access because, as the parent with decision making authority concerning medical issues, she feared for S.'s safety. To compensate Father, she contended that she substantially increased S.'s virtual time with Father. In that regard, Mother introduced a chart which, if accurate, showed extensive virtual contact between Father and S. in the March 18 to May 15, 2020 period. According to Mother, in the last-mentioned period, S. and Father spent many hours virtually with one another; i.e., on the telephone, on Facebook or playing computer games. Father testified that the chart introduced by Mother was inaccurate in that it overstated the amount of virtual contact. According to Father, there were many days during the approximate two-month period when he was denied telephone and other types of virtual contact with S.

Mother testified that when she offered 18 days make-up time on May 14, 2020, Father replied by email that she could "pick [S.] up on Monday [May 18], as stated by the

---

[5] The parties stipulated that the first "presumptive case relating to COVID-19" in New Orleans was announced on March 9, 2020.

court order" and that he would "get directions from the [c]ourt on the make-up time." In his testimony at the hearing, Father asked the court to award him access to S. for 10 weekends straight (rather than every other weekend), plus access to S. for Easter 2021.

Mother testified that she no longer believed the court should award make-up time. She explained that her reasons were the same as those that her counsel talked about in his opening statement, *viz*.:

> I offered him back the 18 days[6] the moment that I could. He refused it, stopped all negotiations, and said he wants to go to litigation and have the [c]ourt decide. So, I just don't think that that's an appropriate way to, to co-parent.

During Mother's testimony, counsel for Father asked several questions as to whether Mother had abided by the following provision in the final custody order:

> ORDERED, that [Mother] be, and she is hereby awarded the sole physical care and custody of the minor child, subject to rights of visitation, as expressly delineated herein, afforded to [Father] as follows:
>
> * * *
>
> B. Every Wednesday evening from 6:30 P.M. until 8:15 P.M., for the express purpose of attending the Youth Group activity at [Father's] church. [Mother] shall drop off and pick up the minor child at Church. This access need not occur in the event of illness or injury of the minor child; unforeseen emergent conditions; the imposition of a snow emergency plan for Frederick County . . . .

The youth group mentioned in the final custody order was one that Father conducted, in his capacity as the youth pastor for his church. In response to Father's

---

[6] Previously, Mother in her testimony spoke of 21 days of make-up time but that offer included three days of visitation (starting May 15, 2020) to which Father was already entitled.

complaint that Mother did not take S. to the youth group meetings at 6:30 P.M. but instead delivered him to the meetings at 7:00 P.M., Mother testified that because the youth group meeting sometimes started at 6:45 P.M. and sometimes at 7:00 P.M., her habit was to deliver S. to the church at the actual starting time. Mother testified that currently the youth group meetings were being held virtually due to the pandemic and S. "attended those meetings."

In regard to the youth group meeting, Father stressed that Mother intentionally disobeyed the court order by ignoring the requirement that she should deliver S. to the meeting at 6:30 P.M. Nevertheless, he did not contradict Mother's testimony as to when the youth meetings started nor did he contend that S. was ever late for a youth group meeting.

Although the motions judge did not say so explicitly, she indicated by her comments at the evidentiary hearing, that she did not consider Mother's "late" arrival at the youth group meeting to be a serious violation of the final custody order because, according to the judge, the intent of the provision was to ensure that S. attend the church's youth group meeting – not to provide Father with extra visitation rights. Also, because at the time of the September 10, 2020 hearing the Wednesday meetings were being held virtually, the issue of when Mother delivered S. to the meetings did not appear to be a current problem.

At the hearing, it was undisputed that Mother intentionally withheld visitation from Father for about two months. Father contended that Mother was not justified in doing so. The motions judge said that because of the pandemic, Mother should have filed

a motion and requested a modification of the final order; nevertheless, the judge indicated that Mother's actions were perhaps understandable because at the time she withheld visitation, the dangers posed by the pandemic were truly frightening and at that point, no one knew the dangers posed by the COVID-19 crisis.[7]

There was one other issue in contention at the September 10 hearing. The final custody order provided that Father, beginning September 6, 2019, had a right of visitation with S.:

> [E]very other weekend from after school on Friday until Monday at the beginning of the school day, if school is in session that day or 8:00 A.M., whichever occurs first. The [Father] . . . shall pick up the minor child from school on Friday and deliver the minor child to school on Monday if school is in session that date. . . . In the summer, [Father] shall retrieve the minor child from the [Mother's] residence at 3:30 P.M. on Friday.

Father's complaint was that prior to the pandemic, at the school that S. attended, classes stopped at 3:30 P.M. on Friday, but since the pandemic, S.'s virtual classes ended at noon but Mother refused to allow S. to be picked up until 3:30 P.M. Father's position was that this deprived him of over three hours of visitation each weekend that he had a

---

[7] After admonishing Mother for disobeying provisions of the final custody order by means of "self-help," the judge went on to say:

> [t]hat being said, I recognize that we were facing something that was wholly different than anyone had ever faced before maybe in 1919, or whatever it was, with the flu pandemic they had going around, but, in our lifetimes, we had never experienced this. It was very scary and I understand that. And I understand that [S.] is, in fact, in the very compromised group. He also is younger, which, you know, I think is proving out now that the younger you are the better off you are to some degree, but he is in the group that is more heavily affected by this virus as we know it today.

right of access. At the hearing, Mother's testimony as to why she did not allow Father to pick up S. earlier on Fridays was based on the school schedule. That schedule provided that between 8:30 A.M. and noon, classes and other activities were to be conducted virtually; thereafter, a one-half hour lunch break was to begin. The school schedule then spelled out what was to occur during the periods between 12:30 and 1:45 P.M. Under the heading "Student Support," the schedule for that time period read:

- Virtual F2F [Face to Face] Instruction
- Intervention
- On-Line Resource and Service Delivery
- IEP/EL Skill Recovery

Activities for the period between 1:45 P.M. and 3:30 P.M., were listed under the heading "Self-Directed Student Work Time" as follows:

- Reading and researching
- Completing projects
- Responding to teacher feedback
- Engaging in online lessons and practice

Mother explained that she kept S. until 3:30 P.M. on Fridays because the school schedule indicated that school was open until 3:30 P.M. In her words, "[i]f they [the high school authorities] intended kids to stop at 12:00, they would have ended at 12:00. And, so, I just want to protect that time, so [S.] has the time to do his work." Put another way, according to Mother, the school had issued a schedule that states that between 1:45 and 3:30 P.M., "Monday through Friday there's supposed to be self-directed student work time," and she abided by that schedule. Father, in his testimony, contended that under the school schedule, between 12:30 and 3:30 P.M., S. was supposed to be doing homework,

and that S. could do his homework at Father's house just as conveniently as at Mother's residence.

Additional facts will be set forth in order to answer the questions presented.

## II.

### *Make-Up Time*

Father contends that the motions judge abused her discretion in denying him make-up time because the court's denial was based on "an incorrect legal premise." In her oral ruling concerning make-up time, the trial judge said:

> [Father] wants make-up time, and that's where I get to this isn't a contract case. If this were a contract case, I could say write a check for X amount of dollars, and that will remedy this problem. My concern is what is best for [S.], and I gave a custody order that I believed was necessary for [S.'s] best interest last year. I still believe that schedule is necessary for [S.'s] best interest. You [S.'s parents] cannot communicate historically. Through [many] days of trial [in 2019, it has] become very, very clear, even about basic medical decisions you can't communicate, you can't agree. I can't, in good conscience, say that in order to rectify this, I go away from what I already decided what was in [S.'s] best interest.

> So, therefore, <u>I'm not going to give you any make-up time, because it's not about making you whole. It is about [S.'s] daily life, and I understand [S.] was harmed by not seeing you,</u> I'm not disagreeing with that. We were all harmed [by COVID-19]. All of these kids that are sitting at desks in their home are being harmed. Some of that is there's nothing anyone can do about it. Nobody likes it, but there's nothing anyone can do about it, but I found previously that the schedule I outlined was what was necessary given the level of distrust and discord between the two of you, and I still find that that's accurate.

> So, therefore, the motion for make-up time is denied, but I am going to caution [Mother] very strongly that a motion is required [to change the final custody order]. Sole legal or whatever, does not give you authority to say I'm overriding the visitation schedule that this [c]ourt ordered, that is not accurate. You must file a motion, but, again, the acrimony and distrust

13

is so great that I don't find a modification of the order I had entered to make-up visitation is appropriate.

(Emphasis added.)

Father takes issue with the part of the judge's opinion where she said, "I'm not going to give you any make-up time, because it's [the decision as to whether or not to award make-up time] not about making you whole.  It is about [S.'s] daily life[.]"  In support of his contention that the aforementioned statement was not "supported by law," Father directs our attention to Maryland Code (2019 Repl. Vol.), Family Law Article, § 9-105, which provides:

> In any custody or visitation proceeding, if the court determines that a party to a custody or visitation order has unjustifiably denied or interfered with visitation granted by a custody or visitation order, the court <u>may</u>, in addition to any other remedy available to the court and in a manner consistent with <u>the</u> <u>best</u> <u>interests</u> <u>of</u> <u>the</u> <u>child</u>, take any or all of the following actions:
>
> (1) order that the visitation be rescheduled;
>
> (2) modify the custody or visitation order to require additional terms or conditions designed to ensure future compliance with the order; or
>
> (3) assess costs or counsel fees against the party who has unjustifiably denied or interfered with visitation rights.

(Emphasis added.)

As can be seen, in enacting § 9-105, the General Assembly used the word "may."  "The word 'may' is generally considered to be permissive, as opposed to mandatory, language."  *Board of Physician Quality Assurance v. Mullan*, 381 Md. 157, 166 (2004); *Brodsky v. Brodsky*, 319 Md. 92, 98 (1990).  *See also Planning Comm. v. Silkor Development Corp*., 246 Md. 516, 522-24 (1967) (absent clear legislative indication to

14

the contrary, "may" is generally presumed to apply in a "permissive sense."). Because the legislature used the word "may," and because there is no indication that the legislature did not intend the word to be interpreted as permissive, it was not mandatory that the court award make-up time when, as here, one parent unjustifiably denies another visitation. Thus, in order for Father to prevail as to the first question presented, he must demonstrate that the motions judge abused her discretion in not granting him make-up time.

> The analytical paradigm by which we assess whether a trial court's actions constitute an abuse of discretion has been stated frequently. In *Wilson v. John Crane, Inc.*, 385 Md. 185 (2005), for example, we iterated
>
>> [t]here is an abuse of discretion "where no reasonable person would take the view adopted by the [trial] court[ ]" . . . or when the court acts "without reference to any guiding principles." An abuse of discretion may also be found where the ruling under consideration is "clearly against the logic and effect of facts and inferences before the court[ ]" . . . or when the ruling is "violative of fact and logic."
>>
>> Questions within the discretion of the trial court are "much better decided by the trial judges than by appellate courts, and the decisions of such judges should be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred." In sum, to be reversed "[t]he decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court[] deems minimally acceptable."
>
> 385 Md. at 198-99 (quoting *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312-13 (1997)). An abuse of discretion, therefore, "should only be found in the extraordinary, exceptional, or most egregious case." *Wilson*, 385 Md. at 199.

*Pasteur v. Skevofilax*, 396 Md. 405, 418-19 (2007).

Relying on § 9-105, appellant contends that "Maryland law specifies that ordering the rescheduling of visitation is just one of the remedies available to the court <u>for the purpose of making the party, which was unjustifiably denied visitation, whole</u>." (emphasis added). Contrary to what is implied in the above argument, the statute does not specify that the purpose of § 9-105 is to "make whole" the party that is unjustifiably denied visitation. The statute simply gives the court the option of ordering make-up time, but the court is not required to exercise that option. In fact, the statute provides that in order to exercise the option, such an award must be "consistent with the best interests of the child[.]" Here, the motions judge explained that she did not believe it to be in the best interests of S. to order make-up time. The court's decision was understandable. After all, at the time of the September 10, 2020 hearing, approximately three and one-half months had expired since Mother allowed Father to resume visitation in accordance with the court order. After that lapse of time, arguably at least, it might well be disruptive to S.'s routine if, rather than keeping him on the every other weekend visitation schedule with Father, the court ordered that Father have access for ten straight weekends as Father requested.

It is true, as the motions judge stated, that Mother's actions in denying visitation to Father for almost two months was harmful to S. But that does not necessarily mean that the harm could be erased or even ameliorated by ordering make-up time, nor does it mean that it would be in S.'s best interests to do so.

Father disagrees, arguing that:

16

> The [c]ourt makes the confusing argument that withholding make-up time from the Defendant is in the best interests of the child because the court believed the schedule ordered in September 2019 was in the child's best interests the previous year and that the court could not go away from what was already decided a year earlier. However, this was not a modification of custody hearing. This simple hearing was to enforce the court order and provide missed like-time back to the Appellant, which the Appellee initially recommended to the [c]ourt in its motion *Plaintiff's Preliminary Opposition to Defendant's Emergency Motion to Enforce Court's Order Regarding Access During Covid[-]19 Pandemic*, "that the [c]ourt provide for make-up time between the Defendant and the minor child, day-for-day."

(References to transcript omitted.)

Contrary to the implication in the above argument, the trial judge did not misinterpret the statute. It is clear that the trial judge knew what remedies were available to her under § 9-105 of the Family Law Article. Moreover, there is no indication that the judge was confused as to whether she could change what had been previously ordered. As earlier mentioned, the wording of the statute makes it clear that it is within the court's discretion as to whether to utilize any of the remedies set forth in § 9-105. And, whether, as here, both parties agreed at one time that make-up time should be ordered, the court was not bound by any such agreement. For the above reasons, we hold that Father has not met his heavy burden of showing that the trial judge abused her discretion by refusing to grant him make-up time.

### III.

### *The Judge's Conversation with the Magistrate*

In her oral opinion, the motions judge explained at length that the parties could not communicate or attempt to work things out because they were "entrenched in the fight." The judge then said:

I was talking to one of our magistrates about this case, and she said, and I think it is really appropriate, this isn't a contract case where the purpose of damages in a contract case is to make you whole; that's not the purpose of a child custody case. The purpose of a child custody case is [to decide what is in] the best interest[s] of [S.]

Father argues that the motions judge abused her discretion by "consulting with a [m]agistrate" prior to rendering her decision. Appellant's precise argument in this regard is as follows:

The [c]ourt is required to make its own independent decision as to the ultimate disposition of any case although it can be guided by a magistrate's recommendation. The Domingue[s]-Kirchner standard, requires the court to conduct an "independent review of the record and of the facts found . . . and apply its independent judgment in reaching its conclusions." In this case, the court heard both parties and then consulted with a magistrate behind closed doors to determine that "this isn't a contract case where the purposes of damages in a contract case is to make you (Appellant) whole." Besides the fact that the [m]agistrate did not hear either party and was not present in the court room to hear the case and could not logically or with integrity make an educated decision in just a few minutes, the court's decision to follow the recommendations of a [m]agistrate that was neither present for the hearing nor known to either party is an abuse of discretion.

(Reference to transcript omitted.)

When the judge's remarks are read in context, it is clear that the judge made her own independent decision as to whether to award make-up time. What the magistrate judge said was legally correct and, in essence, the trial judge simply said that she agreed with the magistrate judge's legal analysis. In other words, contrary to Father's argument, the record does not support his contention that the trial judge, rather than rendering an independent decision, allowed a magistrate judge to make the decision, as to whether to grant make-up time, for her.

18

### *Wednesday Night Youth Group Meeting*

Father argues that the trial judge "erred in modifying the court-ordered access for [Father] and abused its discretion in denying the motion to enforce Wednesday-night access, which [Mother] denied in part for over a year." This argument concerns the fact that Mother brought S. to Father's church's youth group at 6:45 P.M. and sometimes at 7:00 P.M., rather than at 6:30 P.M., which was the time set forth in the final custody order. It was clear from the testimony that, with one exception, Mother delivered S. to the meetings at the time those meetings actually started, which was always after 6:30 P.M. The one exception was on Wednesday, March 18, 2020, when Mother, due to the pandemic, did not deliver S. to the meeting at all.

At the hearing, Father never indicated that S. was ever late for the youth group meetings. Instead, he took the rigid position that Mother's conduct constituted a violation of his right to access. But, in a colloquy with Father's counsel, the motions judge indicated that she believed, as the author of the order at issue, that the purpose of that provision was to ensure that S. could attend the meeting of the youth group, which Father happened to lead, but the provision was not intended to grant additional visitation as that term is usually understood.

In this appeal, Father points out, accurately, that the provision at issue appears in the section of the final custody order that governs "visitation." Nevertheless, even assuming, *arguendo*, that Mother was wrong in failing to deliver S. to the youth group meetings at 6:30 P.M., by the time of the September 2020 hearing, those meetings were

all being held virtually and, as far as shown by the record, S. was on time for the virtual meetings. In other words, the problem had been resolved. Because S. never was late for the youth group meetings, it is impossible to see how it would be in S.'s best interests to award make-up time on the grounds that S. did not arrive at the youth group meetings earlier than the scheduled start time. And, aside from awarding make-up time, there was nothing else the judge could have done to remedy this "wrong."[8]

Father also argues that the trial judge erred in "modifying the court-ordered access" insofar as it concerns the Wednesday night meetings. The short answer to that contention is that there was no such modification in the court's December 22, 2020 order. This is shown by the last paragraph of that order quoted, *supra*, at page five.

## V.

### *Friday Pick-Up Time*

Father next argues that the court "erred in modifying the court-ordered access for [Father] and abused its discretion in denying the motion to enforce the weekend-access pick-up time afforded [Father].[9] This argument concerns the part of the final custody order (*see* page 1, *supra*) stating that Father's weekend visitation started "after school" on "Friday[s]." Father contends that since visitation resumed on May 15, 2020, S. has been taught virtually and those virtual sessions ended at noon; therefore, he asserts that Mother

---

[8] Father never asked the judge to hold Mother in contempt.

[9] In his motion to enforce, Father failed to allege that Mother denied him access time by altering the Friday pick-up hours. The reason for this failure is that the problem did not arise until students, such as S., began attending school virtually – which was after the date the Father filed his motion to enforce.

acted improperly in not allowing him to pick S. up at noon. But if Mother's testimony was credited, authorities at S.'s school published a schedule that showed that S.'s school day was not finished at noon on Fridays. Students were required to do schoolwork until 3:30 P.M. on Fridays. In this regard, the motions judge orally ruled as follows:

> I looked at the [final custody] order. The court order says that, when school is in session, he will retrieve the child from school. It does say in the summer it will be 3:30. Right now or maybe, I don't know, he may have virtual face-to-face instruction, he may have online resource and service still over, he may have some of these blocks filled in that maybe aren't being utilized right now, I'm not sure, but the school day ends at 3:30 p.m., and that is when the parties will exchange [S.]. It doesn't end at 12 o'clock. It doesn't end at 11:20. The school day ends at 3:30, and that is when the parties will exchange [S.]; that was the easier part.

Father complains that when his attorney was making his opening statement, the motions judge agreed that the school day ended at 12:00 P.M. The record shows that the judge did not make a ruling at that point. Read in context, the motions judge was simply making inquiry as to Father's position as to when the school day ended.

Father also contends that Mother acknowledged that "school ended at 12:00 P.M." As can be seen from the re-cap of Mother's testimony set forth above, Mother made no such acknowledgment. She testified, based on the school schedule, that there is "supposed to be self-directed student work time" Monday through Friday between 1:45 and 3:30 P.M., and if the school intended the day to end at 12:00 P.M., the school system would not have it on its schedule that school ended at 3:30 P.M.

There was merit in Mother's position. If a student obeyed the school schedule, it is clear that he or she was not allowed to play games or pursue other recreational activities between 12:30 P.M. and 3:30 P.M. on Fridays. Instead, until 3:30 P.M., the

21

school day was not finished because students were supposed to engage in such things as "Virtual F2F Instructions" and [r]esponding to teacher feedback." Because the school day was not finished, Father had no right to pick up S. at noon even if Father was correct when he said that S. could do schoolwork at his home just as well as at Mother's. We therefore hold that the judge was not clearly erroneous when she found that the pick-up time for Father's weekend visitation was 3:30 P.M. and not noon.

Father makes a related argument that advances some of the same contentions that we have already considered and rejected. He phrases his argument as follows:

> As [Father] stated that school ended at noon, and as [Mother] acknowledged that school ended at noon but did not want to release him because the child had homework, and as the court acknowledged that school ended at noon, the child should have been released to [Father] at noon per the court order. The fact that the child may or may not have homework at the end of the school day is irrelevant to the pick-up time of the child. Furthermore, the modification of the court order was not requested by either party in any motion and adds further confusion regarding the pick-up time of the child. Currently, there is more litigation of the pick-up time[10] because school ends at 12PM as verified by the child's principal and documentation, but the [Mother] refuses to release the child to the [Father], coming up with her own arbitrary end-of-school time of 2:30 P.M. [sic]. The [c]ourt continues to be silent on the issue, declining to rule one way or the other, assumedly until the school year is over and the motion becomes moot. Modifying the court order absent a motion to do so, so that [Father's] already limited time with the child is further reduced by 3 hours every-other-weekend, is an abuse of discretion.

The above arguments are inconsistent in that Father contends, on the one hand, that the motions judge declined to make a ruling as to the time the school day ended and,

---

[10] While his appeal was pending, Father, on February 5, 2021, filed a "Motion to Modify Access/Pick-Up Time."

on the other hand, complains that the court, without request, modified the prior order insofar as it dealt with the issue of the Friday pick-up time. In any event, as already mentioned (*see* page 5, *supra*), the court, in its December 22, 2020 order, second paragraph, did decide the pick-up time issue and the court did so for good reason inasmuch as Father's attorney specifically asked the court to decide that issue.[11]

Contrary to Father's argument, the court did not modify the order in such a way as to give Father less visitation than that to which he was entitled. Instead, the order simply announced the court's ruling concerning an issue that arose after the motion for an emergency order was filed and had developed into another source of disagreement between the parties. After reviewing the school schedule that was introduced into evidence together with the testimony of the parties, the motions judge concluded that the school day for S. ended at 3:30 P.M. on Fridays, which was the same time that it ended in September 2019, when the final custody order was filed. The school schedule (defendant's exhibit 1) supported the judge's conclusion that school ended at 3:30 P.M.

---

[11] In his opening statement, Father's counsel said:

[Father] has been asking if he could pick him up early on Fridays. I think when the parties testified before you before at the custody trial, [Mother] said she's not wanting to do anything to keep him from having time with his dad, and he's been asking if he could pick him up early on Friday. And, so, that's something [Father] would ask the [c]ourt to award. [Mother] has been indicating that she wants him to pick him up at 3:30. So, that's the parties' positions, he'd like the noon, she'd like the 3:30, unless she's changed since they last e-mailed each other.

We hold that the judge did not abuse her discretion when she resolved this minor dispute or when she signed the December 22, 2020 order that reflected that resolution.

## VI.

### *Attorney's Fees*

Father contends that the trial judge erred in failing to award him attorney's fees. In support of that contention, he directs our attention to Family Law Article, § 12-103 which provides:

> (a) The court <u>may</u> award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person:
>
>                 \*   \*   \*
>
> (2) files any form of proceeding:
>
>                 \*   \*   \*
>
>     (iii) to enforce a decree of custody or visitation.
>
> (b) Before a court may award costs and counsel fees under this section, the court shall consider:
>
> (1) the financial status of each party;
> (2) the needs of each party; and
> (3) whether there was substantial justification for bringing, maintaining, or defending the proceeding.
>
> (c) Upon a finding by the court that there was an absence of substantial justification of a party for prosecuting or defending the proceeding, and absent a finding by the court of good cause to the contrary, the court shall award to the other party costs and counsel fees.

(Emphasis added.)

Here, the motions judge did not make a finding that Mother lacked substantial justification in defending against Father's motion to enforce. The judge explained her reason for denying both parties their request for attorney's fees, by saying:

> As to attorney's fees, [Mother] should have filed a motion [to modify custody order] and she did not. [Father] should have communicated with her, and he did not. When she said I'll give you 18 days, I wouldn't have done that, which is clear here today. He should have said, instead of, no, you took away Easter, and you took away my time, and the first birthday of my other child, so we'll let the [c]ourt decide. He should have said I want the next 10 weekends straight, and I want next Easter, will you do that. She probably would have agreed, but he wanted to come to court, because, again, it's about the fight, and it's an awful expensive way to spend your life. It's a horrible way for [S.] to spend his life.

> So, both requests for attorney's fees are denied.

As can be seen, Family Law Article Section 12-103(a)(2)(iii) states that the "court may award . . . counsel fees" in "any form of proceeding" that a person files "to enforce a decree of custody or visitation." (emphasis added). Whether to award attorney's fees under § 12-103(a) is a decision that rests in the discretion of the trial or motions judge. *Petrini v. Petrini*, 336 Md. 453, 468 (1994).

Father contends that the judge abused her discretion in failing to award him attorney's fees because he "provided ample evidence that he attempted to work out a solution with [Mother] prior to filing any proceeding in court." The emails that were exchanged between the parties prior to March 27, 2020, the date when the emergency motion was filed, provided no evidence that Father "attempted to work out a solution" with Mother. He offered no compromise. Instead, both parties announced their positions and thereafter refused to budge. More important, and as stressed by the motions judge,

25

once the emergency motion was filed, Father made no attempt to resolve the matter without further litigation. Mother offered Father day-for-day make-up time from May 15 to June 8, 2020, but Father did not even bother to make a counteroffer. The motions judge did not abuse her discretion in finding, in effect, that by failing to make a counteroffer, Father did not have substantial justification for continuing to litigate the make-up time issue, which was by far the main issue that separated the parties.

Father argues that he was justified in filing the March 27, 2020 emergency motion. This is true. But this does not necessarily mean that Mother, in light of the pandemic, did not have substantial justification in defending against the emergency motion. After all, as the trial judge pointed out (*see* page 11 note 6, *supra*), the COVID-19 pandemic created grave and deadly risks that could not have been anticipated by anyone at the time the final custody order was signed. The court faulted Mother only for what she failed to do, i.e., file a motion to modify the custody order based on the health concerns that arose because of the pandemic. The court, with ample support in the record, found that both parties failed to compromise because they put the urge to fight one another in court over S.'s best interests, and as a consequence, both parties were at fault: Mother, because she did not file a motion to modify, and Father, because once he filed the emergency motion, he made no attempt to resolve the matter.

Father also takes issue with the judge's statement that Father "did not communicate with" Mother. According to Father, this "is clear error as [he] both testified to communicating with [Mother] and exhibited multiple emails and text messages between the two parties." There was evidence in the record to support the motion judge's

26

statement that, prior to filing the emergency motion, Father failed to communicate with Mother. For example, in one of the emails that Mother sent to Father shortly before the emergency motion was filed, Mother expressed concern about the fact that Father's stepson, who lived with Father, worked at a McDonald's restaurant. Mother's concern was that because the stepson worked in such a public place, the stepson might be exposed to the coronavirus, and S., if he stayed in the same house with the stepson, might contract the virus. It turned out that by the time Mother expressed concern about the stepson's exposure, the latter had already stopped working at McDonald's. But in the email exchange that preceded the filing of the emergency motion, Father never attempted to alleviate Mother's concerns by sending her an email telling her this.

Next, Father takes issue with the following sentence set forth in the judge's oral opinion. The offending sentence is: "when she [Mother] said I'll give you 18 days, I wouldn't have done that, which is clear here today." Father's complaint is that the trial judge gave no explanation as to why she "would not do that." We disagree. In her oral opinion, the judge said that it was not in the best interests of S., after regular visitation had been restored, to interrupt the rhythm of the usual alternate weekend (Friday to Monday) visitation schedule.

Lastly, Father takes issue with the statement in the judge's opinion in which she opined that Father: "should have said I want the next 10 weekends straight, and I want next Easter, will you do that? She [Mother] probably would have agreed, but he wanted to come to court, because, again, it's about the fight and it's an awful expensive way to spend your life." Father's precise criticism of that statement is that it overlooked the fact

27

that Father was compelled to file the emergency motion. The judge plainly did not overlook that fact. She was simply making the point that once litigation had commenced, Father showed no inclination to compromise but just wanted to continue to litigate. The history of this case and the trial transcript amply supported the trial judge's view of Father's motives.

In summary, the motions judge had discretion as to whether to award attorney's fees to Father under § 12-103(a) of the Family Law Article. To prove that the judge abused her discretion in failing to award attorney's fees, Father was required to show that "no reasonable person would take the view adopted by the [trial] court." *Wilson v. Crane*, *Inc.*, 385 Md. 185, 198 (2005). In this case, Father has not made such a showing.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

28