*Martique Vanderpool v. State of Maryland*, No. 0047, September Term, 2023. Opinion by Ripken, J.

**CRIMINAL LAW – SEXUAL CONTACT WITH LAW ENFORCEMENT OFFICERS – CUSTODY**

Under CR Section 3-314 a law enforcement officer is prohibited from engaging in sexual acts with a person in their custody. CR § 3-314(e)(1)(iii). The term "custody" should be interpreted consistent with the legislative history of the statute. Thus, a person who does not feel at liberty to terminate the encounter or free to leave satisfies the meaning of custody for the purpose of the statute.

**CRIMINAL LAW – SUFFICIENCY OF THE EVIDENCE**

CR Section 3-314 proscribes that "a law enforcement officer may not engage in sexual contact, vaginal intercourse, or a sexual act with a person . . . in the custody of the law enforcement officer." CR § 3-314(e)(1)(iii). There was sufficient evidence for a jury to find that the individual was in the custody of the law enforcement officer at the time of the sexual intercourse. Md. Code. Ann., Criminal Law § 3-314(e)(1)(iii).

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 0047

September Term, 2023

_____

MARTIQUE VANDERPOOL

v.

STATE OF MARYLAND

_____

Ripken,
Albright,
Kenney III, James, A.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Ripken, J.

_____

Filed: March 27, 2024

In September of 2019, Officer Martique Vanderpool ("Appellant") and Officer Phillip Dupree ("Ofc. Dupree") of the Fairmont Heights Police Department conducted a traffic stop which resulted in the stopped vehicle being towed. Appellant and Ofc. Dupree transported the driver ("K.T.") of the vehicle to the police station, where Appellant engaged in sexual intercourse with K.T.[1] Following the incident, Appellant was indicted for numerous offenses, including law enforcement officer engaging in a sex act with a person in custody.[2] At trial, Appellant was found guilty of the offense of law enforcement officer engaging in a sex act with a person in custody and acquitted of all remaining charges. Appellant timely appealed.

## ISSUES PRESENTED FOR REVIEW

Appellant presents the following issues for our review:[3]

I.   Whether the evidence was sufficient to establish that K.T. was in custody when the sexual intercourse occurred.

II.  Whether the trial court abused its discretion when it prohibited questions during cross examination of the State's witnesses pertaining to K.T.'s related civil lawsuit.

---

[1] The driver in this case has been identified using the initials K.T. to protect her identity. The initials are random and not indicative of the individual's legal name.

[2] Appellant was also indicted for rape in the first degree, rape in the second degree, assault in the second degree, sex offense in the fourth degree, and four counts of misconduct in office.

[3] Rephrased from:
I.   Is the evidence insufficient to convict Mr. Vanderpool?
II.  Did the trial court err in limiting Mr. Vanderpool's cross-examination of the alleged Victim and of Detective Savoy?
III. Was Mr. Vanderpool denied his right to due process after the state committed several Brady Violations?

III.    Whether the trial court erred when it denied Appellant's motion to dismiss on the grounds of discovery violations.

# DISCUSSION

## I.    THE EVIDENCE WAS SUFFICIENT TO ESTABLISH THAT K.T. WAS IN CUSTODY AT THE TIME OF THE SEXUAL INTERCOURSE.

### A.  Factual and Procedural History

In September of 2019, Appellant and Ofc. Dupree stopped a vehicle for speeding. Appellant subsequently approached the vehicle and informed the driver, K.T., of the reason for the traffic stop and requested that she provide her driver's license and registration. K.T. provided the registration for the vehicle and explained to Appellant that she did not have a driver's license, but she did have a permit, although it was not with her at the time.

Per K.T., after she explained the issue regarding her license, Appellant walked away from the vehicle and conversed with Ofc. Dupree. Appellant returned and ordered K.T. to exit the vehicle so that a search of the vehicle could be performed. During the search, Appellant located K.T.'s driver's permit as well as condoms. Upon finding the condoms, Appellant began asking K.T. questions that were sexual in nature such as "[i]f [she] was a prostitute, do[es] [she] cheat on [her] boyfriend, [and] do[es] [she] have sex a lot." K.T. responded by laughing and began "pacing back and forth . . . get[ting] [her] emotions under control." Ofc. Dupree then forcibly restrained K.T. and placed her in handcuffs. When K.T. was put in handcuffs, she lost her phone, which was subsequently retrieved by one of the officers.

Appellant then informed K.T. that the vehicle would be impounded because she did not have a driver's license and the vehicle was towed. The officers transported K.T. to the

2

police station. During transport, K.T. was placed in the front seat of the police cruiser, Ofc. Dupree drove and Appellant rode in the back seat. For the duration of the drive to the police station K.T. remained in handcuffs.

K.T. testified that while the police cruiser was "unmarked[,]" it did have lights and sirens and the "whole police work, . . . computers and all of that stuff inside." She also testified that Ofc. Dupree was in uniform and Appellant was wearing "the pants. . . and the belt but not the shirt." She explained that the belt was a "police officer belt that keeps all the instruments, the weapons, and all that stuff on it."

Once they arrived at the police station, K.T. was seated in a chair and remained handcuffed, while Appellant sat behind a desk. K.T. testified that she and Appellant began discussing "what we were going to do, what solution we were going to come up with of me getting my car back." During the conversation, Appellant asked K.T. if she had the money and what she thought they should do, and then "sex came about" in the discussion. K.T. asked to use her phone and the office phone, but both requests were denied. K.T. testified that in denying the requests Appellant stated that "safety protocols" were the reason for denying the use of the phones, although the safety protocol itself was not explained.

Appellant suggested having sexual intercourse with K.T. and then departed the room. K.T. did not "think he was serious[,]" until Ofc. Dupree asked her "if [she] was going to do it." K.T. testified, "I wasn't really too sure. I told him, I'm not sure. It doesn't really seem I have much of an option here. I can't really call, get my car back, and yeah."

When Appellant re-entered the room, he asked K.T. if she had "thought about it."

3

K.T. testified that she felt like she could either "go to jail or have sex." At this point, she agreed and Appellant removed his police belt before lowering his pants and undergarments. Appellant proceeded to have sexual intercourse with K.T. After the sexual intercourse terminated, K.T. was permitted to use the restroom to clean herself. K.T. testified that she was then served with criminal and traffic citations, which were written by Appellant. Ofc. Dupree, Appellant, and K.T. returned to the police cruiser and K.T. was driven to retrieve her vehicle from the tow lot. Without having paid, the vehicle was released to K.T. at the request of Appellant. Additional facts will be incorporated as they become relevant.

**B. Parties' Contentions**

Appellant argues that the evidence is insufficient to sustain his conviction because the State failed to establish that K.T. was in his custody at the time of the sexual intercourse. Because the statute here does not define custody, Appellant urges this Court to define custody in a manner consistent with what he contends is the applicable current legal definition of the word. Hence, Appellant asserts custody should be read to "require[] the law enforcement officer to physically restrain one's movement and maintain control over a person's liberty to move about." In the alternative, Appellant contends that if this Court finds K.T. was in custody at the time of the sexual intercourse, she was solely in the custody of Ofc. Dupree and not Appellant.

The State disagrees and relies on the legislative history of the statute to support the contention that the term custody, as used here, need not be further defined within the statute. The State posits that the plain meaning of the term is applicable, and the definitions of custody proposed by the Appellant apply only in other limited circumstances and are

not applicable here. Per the plain meaning of custody, the State argues that the evidence was sufficient to establish that K.T. was in the custody of Appellant when the sexual intercourse occurred. Furthermore, the State asserts that Appellant's alternative argument, that K.T. was solely in Ofc. Dupree's custody at the time of the sexual intercourse, has no merit.

### C. Standard of Review

This Court reviews claims of insufficiency of the evidence by determining "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Howling v. State*, 478 Md. 472, 493 (2022) (emphasis in original). To accomplish this task, we view the evidence "in [a] light most favorable to the State," and give due deference to the jury's "finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *White v. State*, 363 Md. 150, 162 (2001) (quoting *McDonald v. State*, 347 Md. 452, 474 (1997)). When an evaluation of the "sufficiency of the evidence involves an interpretation and application of Maryland statutory and case law" we must preliminarily "determine whether the lower court's conclusions are legally correct under a *de novo* standard of review." *Rodriguez v. State*, 221 Md. App. 26, 35 (2015) (internal quotation marks and citation omitted).

### D. Statutory Interpretation

Statutory interpretation is a well-established practice in Maryland that has but one primary goal: "to ascertain and effectuate the General Assembly's purpose and intent when it enacted the statute." *Shivers v. State*, 256 Md. App. 639, 658 (2023) (quoting *Wheeling*

*v. Selene Fin. LP*, 473 Md. 356, 376 (2021)). In effectuating that goal, "[w]e begin with an examination of the text of a statute within the context of the statutory scheme to which it belongs, then typically review the legislative history to confirm conclusions or resolve ambiguities, and finally may consider the consequences of alternative interpretations of the statute." *Westley v. State*, 251 Md. App. 365, 386 (2021).

Our analysis begins by "look[ing] to the normal, plain meaning of the language of the statute[;]" however, "[o]ur inquiry is not confined to the specific statutory provision at issue on appeal. Instead '[t]he plain language must be viewed within the context of the statutory scheme to which it belongs[.]'" *Id.* at 386–87 (quoting *Berry v. Queen*, 469 Md. 674, 687 (2020)). "That context may include the statute's 'relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.'" *Id.* at 387 (quoting *Berry*, 469 Md. at 687). When reading the plain language of the statute, our objective is to ascertain whether the statute is ambiguous. *See Blackstone v. Sharma*, 461 Md. 87, 113 (2018); *see also Phillips v. State*, 451 Md. 180, 197 (2017). If the meaning of the statute is apparent from the plain language and its context, the statute is unambiguous, and the analysis is complete. *See State v. Williams*, 255 Md. App. 420, 440–41 (2022); *see also Phillips*, 451 Md. at 196–97.

In contrast, if the statute is ambiguous, either because it has two reasonable interpretations or because "the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme," we resolve the ambiguity by turning to other indicia of the legislature's intent. *State v. Bey*, 452 Md. 255,

266 (2017). Other indicia may include "the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Wheeling*, 473 Md. at 377 (quoting *Lockshin v. Semsker*, 412 Md. 257, 276 (2010)). Ultimately, "the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Id.*

At issue in the present case is the interpretation of the word "custody" as used in section 3-314(e) of the Criminal Law Article ("CR") of the Maryland Code. CR § 3-314(e) (2018). As the term custody is not defined within the statute, we will begin by "discerning the ordinary and popular meaning" of the term. *Berry*, 469 Md. at 688. Preliminarily, we "consider the dictionary definitions of . . . [custody] to derive [its] common understanding" because "the 'ordinary, popular understanding of the English language dictates interpretation of [the statute's] terminology.'" *Id.* at 688–89 (quoting *Johnson v. State*, 467 Md. 362, 372 (2020)); *see also Marriot Emps. Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 447 (1997) ("Although dictionary definitions do not provide dispositive resolutions of the meaning of statutory terms, dictionaries . . . do provide a useful starting point for determining what statutory terms mean, at least in the abstract, by suggesting what the legislature could have meant by using particular terms.") (internal quotations and citations omitted).

Both the standard dictionary definition and the legal dictionary definition of custody are informative. The word custody is defined in Merriam-Webster as the "immediate charge and control (as over a ward or a suspect) exercised by a person or an authority." *Custody*, MERRIAM-WEBSTER, https://perma.cc/BGH2-AQJM. Similarly, in Black's Law

7

Dictionary custody is defined as "[t]he care and control of a thing or person for inspection, preservation, or security." *Black's Law Dictionary* 483 (11th ed. 2019). Both the legal and popular definitions conceptualize the state of custody as a person being under the control of another. While being under the control of another is inherent to any meaning of custody, the term has multiple interpretations in criminal matters; these interpretations invoke varying degrees of control.[4] Thus, because custody has a variety of reasonable interpretations, the term is ambiguous and we must consider other indicia of the legislature's intent, including its legislative history, to determine the meaning of custody within CR § 3-314(e) (2018).

We turn to the legislative history of the statute to determine the legislature's purpose and intent when enacting and amending the statute. When the statute was initially passed, it criminalized correctional employees engaging in "sexual acts with inmates[.]" Md. Code

---

[4] In criminal matters, an individual may be in custody in a wide variety of circumstances. Under the *Miranda* application, a person is in custody when a formal arrest or "restraint on freedom of movement of the degree associated with a formal arrest" has occurred. *California v. Behler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks and citation omitted); *see also State v. Rucker*, 374 Md. 199, 209–10 (2003); *Minehan v. State*, 147 Md. App. 432, 440 (2002). A person's freedom of movement is restrained to the degree associated with formal arrest when "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Owens v. State*, 399 Md. 388, 428 (2007) (quoting *Thompson v. Keohane,* 516 U.S. 99, 112 (1995)). Relatedly, custody in the context of escape statutes focuses on the nature of a person's confinement. *See Boffen v. State*, 372 Md. 724, 733–34 (2003). With regard to escape, a person can be in actual or constructive custody. *Id*. at 733–34, 741 (noting "actual custody exists when an individual is confined to the institution itself . . . within the walls of the prison[,]" whereas constructive custody occurs when "an individual is temporarily permitted to leave while still lawfully committed to that institution.") (internal citations and quotation marks omitted). Notably, while each application of custody includes considerations of whether an individual is under the control or authority of another, one type of custody focuses on the circumstances of the situation, whereas the other considers a person's legal status.

8

(1957, 1997 Repl. Vol., 1998 Supp.), Article 27, § 464G (1998). Since the passage of the statute, it has been amended in substance on three occasions, each time expanding the range of individuals covered and circumstances criminalized pursuant to the statute.[5] Notably, these amendments all address a person's lack of ability to consent when under the control of a person in a position of authority.

For example, the 2007 amendment added employees of contractors and any other individuals working within a correctional facility, whether on a paid or volunteer basis, to the group of correctional employees prohibited from engaging in sexual activity with incarcerated persons. *See* CR § 3-314(b) (Oct. 1 2007). Similarly, the 2016 amendment to the statute prohibited court-ordered service providers from engaging in sexual activity with individuals ordered to obtain their services. *See* CR § 3-314(d) (Oct. 1 2016).

In 2018 a third substantive amendment, adding the provision at issue herein, was introduced in response to accounts nationwide of law enforcement officers having sexual intercourse and engaging in other sexual acts with individuals the officers had arrested. Hearing on H.B. 1292 Before the H. Jud. Comm., 438th Sess. (Md. 2018) (statement of Del. Brooke Lierman), JUD_2_27_2018_meeting_1 (maryland.gov) (advance video to

---

[5] We note that a substantive fourth amendment was made in 2021 when the General Assembly expanded the scope of individuals protected by the statute—in other words—those with whom law enforcement officers are prohibited from engaging in sexual activity. Although not in effect at the time herein, the statute now also prohibits law enforcement officers from having sexual intercourse with a person "who is a victim, witness, or suspect in an open investigation that the law enforcement officer is conducting, supervising, or assisting with if the law enforcement officer knew or should have known that the person is a victim, witness, or suspect in the investigation;" and individuals "requesting assistance from or responding to the law enforcement officer in the course of the law officer's official duties[.]" CR § 3-314(e)(1)(i)-(ii).

1:34:22). The original form of the bill proposed a requirement that police departments enact a policy that, during the course of an investigation, police were prohibited from engaging in sexual activity with victims, witnesses, or suspects in that investigation; however, when the bill reached the House for a vote it had been amended to criminalize law enforcement officials having sexual intercourse with those in their custody. *Compare* H.B. 1292, 2018 Leg., Reg. Sess. 438 (Feb. 9, 2018) https://perma.cc/R6NE-YH7E *with* H.B. 1292, 2018 Leg., Reg. Sess. 438 (Mar. 19, 2018) https://perma.cc/L5RK-269E.

The lead sponsor of the bill, Delegate Brooke Lierman ("Del. Lierman"), explained that "[t]his bill seeks to clarify that there can be no consent from a . . . person who is in custody with an on-duty law enforcement officer." Hearing on H.B. 1292 Before the H. Jud. Comm., 438th Sess. (Md. 2018) (statement of Del. Brooke Lierman), JUD_2_27_2018_meeting_1 (maryland.gov) (advance video to 1:34:22). This is because, as explained by Del. Lierman, "[a] person in police custody can't give genuine consent free from coercion." [6] *Id*.

During a subsequent hearing on the bill in the Senate, Del. Lierman responded to a committee member's question regarding the definition of custody. Hearing on HB 1292 Before the S. Comm. On Jud. Procs., 438th Sess. (Md. 2018) (statement of Del. Brooke Lierman) JPR_3_27_2018_meeting_1 (maryland.gov) (advance video to 4:30). The inquiring Senate committee member noted that custody was not defined in the bill and asked Del. Lierman to provide a definition. *Id*. Del. Lierman stated that the definition of

---

[6] We find Del. Lierman's testimony to be notable as she was the lead sponsor for House Bill 1292 from its initial introduction.

10

custody should be based upon case law, not a statutory definition, ultimately indicating that custody not only occurs when an individual is read their *Miranda* rights, but also when "you feel like you can't leave." *Id*. This understanding of custody is consistent with the purpose of the bill and the history of the statute expanding the circumstances when specified classes of individuals are prohibited from engaging in sexual acts with a person under their control or authority due to that person's lack of ability to consent.

Thus, we conclude that an individual is in the custody of a law enforcement officer for the purposes of this statute when a reasonable person would have felt he or she was not free to terminate the encounter and leave or was formally arrested.

### E. Application

Applying the meaning of custody within CR § 3-314(e) to the facts at issue, we conclude that a rational trier of fact could have found beyond a reasonable doubt that K.T. was in the custody of Appellant during the sexual intercourse. Notably, the evidence adduced at trial included voice messages from Appellant to a friend wherein he described the sexual intercourse and admitted that K.T. was in his custody when he had intercourse with her. In addition to the voice message, the circumstances immediately preceding and following the sexual intercourse support that the evidence was sufficient for a rational juror to find beyond a reasonable doubt K.T. was in custody during the sexual intercourse.

The encounter with law enforcement began on the side of the roadway late at night when the vehicle K.T. was driving was pulled over for speeding by an unmarked vehicle that was identifiable as a police car with lights and sirens. K.T was handcuffed, her vehicle was towed, and then she was transported in the police car to the police station. Upon

11

arriving at the police station, K.T. remained handcuffed during a conversation with Appellant about "what [they] were going to do . . . about [her] car being impounded[,]" and the handcuffs were removed at some point later. Additionally, Appellant twice denied K.T. the opportunity to make a phone call. Further, K.T. testified that she was not given the citations until after the sexual intercourse occurred. Following the sexual intercourse, K.T.'s phone was returned to her and she was driven to retrieve her vehicle from the tow company. Notably, K.T testified that she felt like she had no option but to "go to jail or have sex."

These facts support the inference that a reasonable person would not feel at liberty to end the encounter and leave, nor would such a person have been able to terminate the encounter. As such, Appellant and Ofc. Dupree established an environment where a reasonable fact finder could conclude beyond a reasonable doubt that K.T.'s freedom of movement was restrained, and she was not free to leave.

For the same reasons, Appellant's alternative argument that K.T. was only in the custody of Ofc. Dupree is also without merit.[7] While Ofc. Dupree handcuffed K.T. and drove the police car to the station, Appellant actively participated in each stage of the interaction with K.T. Appellant was the initial officer to provide instructions to K.T. upon approaching the vehicle during the traffic stop, informed her that the vehicle would be impounded, denied her the use of a phone in the police station, and wrote the traffic

---

[7] This alternative scenario presented by Appellant seems to interpret the statutory language including custody to be limited to a very narrow reading which we find to be contrary to the legislative intent of the statute. Such a reading could lead to illogical results.

citations which he did not provide until after the sexual intercourse.

Viewing the evidence in the light most favorable to the State, we conclude that a rational factfinder could find that K.T. was in the custody of Appellant at the time of the sexual intercourse. Therefore, the evidence was sufficient to sustain Appellant's conviction for a law enforcement officer engaging in a sex act with a person in custody.

**II.**   **APPELLANT'S QUESTIONS DURING CROSS-EXAMINATION REGARDING THE CIVIL SUIT WERE NOT PRESERVED.**

**A. Factual and Procedural Background**

During cross-examination of K.T., defense counsel sought to question her about the possible existence of a civil lawsuit regarding the incident. The following colloquy occurred:

> [DEFENSE COUNSEL]: We established that you never went to the police, correct?
>
> [K.T.]: Yes.
>
> [DEFENSE COUNSEL]: But you did go to a civil lawyer to sue, didn't you?
>
> [K.T.]: Yes.
>
> [DEFENSE COUNSEL]: How much are you suing for?

After the last question, but before K.T. answered, the State objected to the question seeking to identify the specific amount of damages sought in a lawsuit. The court sustained the objection.

Further, during cross-examination of Detective Cleo Savoy ("Det. Savoy"),[8] defense counsel inquired: "[w]ere you aware of the civil suit that was instituted?"[9] The State objected to the question before an answer was provided and the trial court sustained the objection. In both instances, defense counsel inquired no further regarding a potential lawsuit nor did defense counsel provide a proffer of the relevance or factual foundation to support the questions.

## B. Parties' Contentions

Appellant asserts that the trial court abused its discretion when it sustained the objections to the two questions about a possible civil lawsuit filed by K.T. in relation to the incident. Preliminary, the State argues that the issue was not properly preserved for this Court's review. If preserved, the State contends the court properly excluded the two questions as they were not relevant and would only serve to confuse the jury.

## C. Standard of Review

We agree with the State that the issue is not preserved for our review. This Court need not consider an issue unless it has been preserved in the record of the trial court. *See* Md. Rule 8-131(a). Maryland Rule 5-103 articulates the preservation requirements for a claim that the trial court erroneously excluded evidence, including testimony. Md. Rule 5-

---

[8] Det. Savoy was a detective with the Prince George's County Police Department whose assignment at the time she interviewed K.T. was handling criminal investigations of police officers.

[9] Appellant does not quote or cite to the question Det. Savoy was asked about the lawsuit in his brief. We focus on the question above as it appears to be the sole question Det. Savoy was asked about the lawsuit.

14

103. "[T]o preserve a claim that a trial court erroneously excluded evidence, the party must be prejudiced by the ruling and 'the substance of the evidence was made known to the court by offer on the record or was apparent from the context within which the evidence was offered.'" *Devincentz v. State*, 460 Md. 518, 535 (2018) (quoting Md. Rule 5-103(a)(2)). "The preservation rule applies to evidence . . . develop[ed] through cross-examination. While counsel need not—and may not be able to—detail the evidence expected to be elicited on cross-examination, when challenged, counsel must be able to describe the relevance of, and factual foundation for, a line of questioning." *Peterson v. State*, 444 Md. 105, 125 (2015). The purpose of the rule is to "prevent[] unfairness and requir[e] that all issues be raised in and decided by the trial court[.]" *Id*. at 126 (quoting *Grandison v. State*, 425 Md. 34, 69 (2012)).

**D.  Analysis**

Here, defense counsel did not proffer the relevance or foundation for the question about the amount of a possible civil lawsuit; instead, counsel opted to continue to another area of cross-examination. By failing to proffer the relevance and foundation of the question there is nothing for this Court to review. *See Grandison v. State*, 305 Md. 685, 742 (1986). To the extent the foundation of the question is evident from its context, any potential relevance of the exact value of a possible civil lawsuit is unclear from the record. Defense counsel was required to demonstrate a relevant relationship between the expected testimony and the issue before the court. *See Grandison v. State*, 341 Md. 175, 208–10 (1995). We decline to speculate on potential theories of relevance. *See Peterson*, 444 Md.

15

at 126 (quoting *Grandison v. State*, 425 Md. 34, 70 (2012)) (noting that trial counsel should not rely on a reviewing court "to do their thinking for them after the fact.").

Similarly, the foundation of the question asking Det. Savoy about her awareness of a lawsuit was not apparent from the record because defense counsel immediately asked an unrelated question after the objection was sustained. Defense counsel did not articulate the foundation for the question regarding Det. Savoy's awareness of a possible lawsuit. This was particularly important as the possibility of such a lawsuit had already been established through cross-examination of K.T. Hence, as Rule 5-103(a)(2) requires Appellant to be prejudiced by the ruling and make an offer on the record, Appellant's objection to the court's ruling was not preserved. *See* Md. Rule 5-103(a)(2).

Accordingly, neither sustained objection is preserved for our review. *See Tetso v. State*, 205 Md. App. 334, 401 (2012) ("Appellant's counsel continued cross-examination without offering a formal proffer of the content and materiality of the excluded testimony. As such, a claim that the exclusion of evidence constitutes reversible error is not preserved for review.").

Alternatively, if the issue had been preserved for this Court's review, the trial court did not abuse its discretion in limiting the scope of cross examination. "The Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Right[s] guarantee a criminal defendant the right to cross-examine adverse witnesses." *Merzbacher v. State*, 346 Md. 391, 411–12 (1997). Thus, the trial court must allow the "defendant a threshold level of inquiry that exposes to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the

16

reliability of witnesses." *Peterson*, 444 Md. at 122 (quoting *Martinez v. State*, 416 Md. 418, 428 (2010)) (internal quotation marks and brackets omitted).

After the threshold level of inquiry has been met, trial courts "have wide[-]latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Montague v. State*, 244 Md. App. 24, 65 (2019). Accordingly, this Court will not "disturb the exercise of that discretion in the absence of clear abuse[,]" *Martin v. State*, 364 Md. 692, 698 (2001), because "the trial judge . . . is in the best position to determine whether the introduction of certain impeachment evidence would enmesh the trial court in confusing or collateral issues[,]" *Merzbacher*, 346 Md. at 413–14.

Maryland Rule 5-616(a)(4) provides that the "credibility of a witness may be attacked through questions asked of the witness including questions that are directed at . . . [p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely[.]" Md. Rule 5-616(a)(4). As to evidence of civil lawsuits, the "general rule is that evidence of a pending lawsuit by a witness in a criminal prosecution against the accused, arising from the same set of circumstances as the instant criminal prosecution, may reveal a[n] . . . interest in the outcome of the proceedings, or motive to testify falsely." *Martin*, 364 Md. at 699 (citing *Mezbacher*, 346 Md. at 414) (footnote omitted).

Appellant relies on *Martin v. State* to support his contention that the court erred in sustaining both objections. 364 Md. 692 (2001). In *Martin*, a police officer was convicted

17

of theft for taking money from an individual walking down the street. *Id*. at 695–97. At trial, the officer's counsel was prohibited from asking on cross-examination whether the individual had "hired a lawyer to sue [the] city." *Id*. at 699. The Supreme Court of Maryland held that the "trial court erred in refusing to permit defense counsel to attempt to impeach the credibility of the prosecuting witness by eliciting testimony regarding the contemplated lawsuit." *Id*. at 702.

Unlike *Martin*, the court here permitted the threshold level of inquiry when defense counsel was permitted to ask K.T. about her consultation with an attorney regarding a civil lawsuit, whether her testimony was motivated by money, and to address her choice to seek out a civil attorney instead of reporting the incident. Through these questions defense counsel was able to provide the jury with facts from which they "could appropriately draw inferences relating to the reliability of" K.T. *Peterson*, 444 Md. at 122 (quoting *Martinez*, 416 Md. at 428). The evidence regarding K.T.'s pursuit of a civil lawsuit was admitted and we conclude that no abuse of discretion occurred when the trial court limited further questioning into that area, i.e. the amount of the suit.

Furthermore, the court was, likewise, within its discretion when it sustained the objection to the question about Det. Savoy's awareness of a civil lawsuit. Det. Savoy's awareness of a civil lawsuit was not relevant. Additionally, as the information had already been elicited in other testimony, allowing a second line of questioning would have been repetitive. Therefore, this Court will not disturb the trial court's exercise of discretion when it sustained objections to the questions regarding the possible civil lawsuit.

Moreover, in the event the court committed an error when it prohibited defense counsel from asking K.T. a singular question inquiring into the amount of a civil lawsuit, any such error was harmless. A harmless error occurs when an appellate court is "able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict[.]" *Dorsey v. State*, 276 Md. 638, 659 (1976); *see also Crane v. Dunn*, 382 Md. 83, 91 (2004).

This Court concludes that beyond a reasonable doubt, had the circuit court erred in prohibiting the question about the amount of a lawsuit, the exclusion was harmless. There is no reasonable possibility that had the jury been aware of the amount of a lawsuit, it would have changed the verdict. The jury acquitted Appellant of all the offenses that relied primarily on K.T.'s testimony and convicted him only of the offense of law enforcement officer engaging in a sex act with a person in custody. This offense did not hinge on whether K.T. consented to the sexual activity and was supported by Appellant's own admission in a voice message that was played for the jury.

Although not explicitly provided, the likely purpose of the question was to alert the jury that K.T. had motive to fabricate her testimony based on a financial interest in the outcome of the case; however, during cross examination, as discussed *supra*, defense counsel had already elicited testimony establishing that K.T. had a motive to testify falsely when other questions about a civil lawsuit were asked and answered. Further, when considering the effect the specific value of a lawsuit may have had on K.T.'s credibility with the jury, the record and the verdict illustrate that defense counsel was able to employ several lines of questioning to impeach her credibility. Thus, had K.T. testified about the

19

amount of a civil lawsuit, we conclude beyond a reasonable doubt that it would not have changed the verdict. *See Gross v. State*, 481 Md. 233, 271 (2022).

### III. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED APPELLANT'S MOTION TO DISMISS.

On the third day of trial, Appellant moved to dismiss the charges against him with prejudice on the grounds that the State failed to disclose a recorded transcript which constituted *Brady* material. The court denied the motion. The next day, Appellant requested to be reheard on the motion, asserting that the cumulative effect of several *Brady* and discovery violations required a dismissal of the indictment. After hearing Appellant's contentions and the State's response, the court denied the motion to vacate the prior ruling. We recount the alleged violations in turn.

#### A. Factual and Procedural History

##### 1. Witness

Prior to opening statements, Appellant's trial counsel moved to exclude a witness as having not been properly identified in discovery. Until the Friday preceding trial, the witness had been identified only as K.T.'s aunt, and defense counsel had not been provided with the witness's name, address, or phone number. The court agreed with the defense that the insufficient identification was a violation of the discovery rules, and imposed a sanction, barring the State from calling the witness to testify.

##### 2. Cash App Payments

Two days before trial, the State notified defense counsel that it had learned of the existence of a single Cash App payment K.T. received from Ofc. Dupree, as well as text

20

messages between the two.[10] During cross examination of K.T., defense counsel introduced into evidence the singular Cash App payment disclosed by the State, in addition to five other payments that Ofc. Dupree made to a separate Cash App account also owned by K.T. The State avowed that it had no knowledge of the second Cash App account, or any payments made to it, prior to the introduction of such by Appellant.

### 3. WhatsApp Messages

The State introduced into evidence six voice messages Appellant sent to a testifying witness via WhatsApp.[11] In the messages, Appellant described in substantial detail the traffic stop of K.T. and subsequent events of the encounter, including the details of his sexual intercourse with K.T. One message stated that K.T. was in Appellant's custody while the sexual intercourse occurred. Other messages described Appellant's thought process for writing K.T. tickets and that any case would turn on "[his] word against hers[.]"

The State began playing the third voice message where Appellant described his sexual intercourse with K.T. and then spoke about his intent to "hook[ ]up" with a woman that was not K.T. As the message was playing, Appellant's counsel objected based on relevance and prejudice, asserting that the message was about another woman. The court ruled that the first 48 seconds of the message discussing K.T. were relevant but required the State to redact the remainder of the message, and instructed the jury to disregard the last 25 seconds of the message.

---

[10] Cash App is an electronic payment application.

[11] WhatsApp is a text and voice messaging application.

Following the prejudice and relevance objections, the State proffered the general content of the remaining voice messages it was intending to introduce. Based on the proffer, the court ultimately excluded one message unrelated to K.T. and allowed the relevant portion of the third message into evidence. In addition, the court permitted four other messages in their entirety.

When one of the additional messages sent by Appellant was played, it contained a reference to Bill Cosby that was not discussed in the proffer. The defense made an objection, which the court sustained. The reference was redacted, and the court directed the jury to disregard any reference to Bill Cosby.[12]

### 4. Recorded Interview

In November of 2019, K.T. was interviewed by Det. Savoy. The interview was recorded and transcribed. While the existence of the recorded interview was noted in the discovery packet, Appellant's trial counsel did not receive a copy of the transcript or audio file until after direct examination of K.T. was complete. Once the issue was brought to the attention of the trial court, defense counsel moved to dismiss with prejudice based on the State's failure to provide a transcript or audio recording of the interview.

The court heard and considered the motion and found that the State did not willfully withhold the evidence. The court exercised its discretion to remedy the late production of

---

[12] Bill Cosby has been accused by multiple women of committing sexual assault in widely publicized civil lawsuits. *See, e.g., Lise Lotte-Lublin, et al. v. William Cosby, Jr.*, Compl. No. 2:23-cv-00932-DJA (D. Nev., June 14, 2023). He was convicted of aggravated indecent assault in a criminal case, which was subsequently overturned in 2021. *See Commonwealth v. Cosby*, 252 A.3d 1092 (Pa. 2021).

the statement by recessing early for the day and starting late the next day to provide defense counsel an opportunity to review the statement. The court also ordered K.T. to be recalled the next day to allow defense counsel to cross-examine her about the statement. The next morning, defense counsel cross-examined K.T. concerning the statement.

When the initial motion to dismiss based on the State's failure to turn over the audio recording/transcript of the statement was raised, the court denied the motion. The following day the court permitted additional argument on the issue and subsequently denied the defense request to vacate its prior ruling denying the motion to dismiss. The court explained that while "there was discovery that was not provided in a timely fashion[,]" it was not a "case where any prejudice cannot be cured" and it did not "rise[] to the level of a dismissal."

### B. Parties' Contentions

Appellant argues that the court erred when it denied his motion to dismiss. Appellant's motion was predicated on conduct by the State that violated his due process right to a fair trial. Appellant characterizes the previously discussed four instances of conduct as constituting a "pattern of repeated misconduct by the prosecutors in the case[,]" including two *Brady* violations, which denied him a fair trial. The State disputes Appellant's characterization of the conduct and contends that the conduct instead constituted, if anything, "garden-variety discovery violations, which were appropriately handled by the trial court."

### C. Standard of Review

This Court reviews "a trial court's decision on a motion to dismiss an indictment for an abuse of discretion." *State v. Grafton*, 255 Md. App. 128, 143 (2022). In the event the

decision requires "an interpretation and application of Maryland constitutional, statutory or case law, [we] must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review." *Kimble v. State*, 242 Md. App. 73, 78 (2019) (quoting *Schisler v. State*, 394 Md. 519, 535 (2006)). Similarly, we review a trial court's finding, or lack thereof, of a *Brady* violation *de novo* because "it presents a constitutional issue." *Grafton*, 255 Md. App. at 143. Whereas the decision by a trial court to impose, or decline to impose, sanctions for discovery violations is analyzed under the abuse of discretion standard. *Rosenberg v. State*, 129 Md. App. 221, 259 (1999).

### D. Analysis

We begin by analyzing each instance of conduct. We determine first whether either of the contended instances constitute a *Brady* violation. If not, we then determine what, if any, discovery violations occurred. We analyze the court's ruling on discovery violations and any sanctions or remedies imposed by the trial court for an abuse of discretion. Finally, we review whether the trial court abused its discretion when it denied the motion to dismiss based on all the violations alleged by Appellant.

To establish a *Brady* violation, Appellant must satisfy three criteria: "The evidence at issue must be *favorable to the accused*, either because it is exculpatory, or because it is impeaching; that evidence must have been *suppressed by the State*, either willfully or inadvertently; and *prejudice* must have ensued." *Adams v. State*, 165 Md. App. 352, 362 (2005) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (emphasis in original)); *see also Ware v. State*, 348 Md. 19, 38 (1997). At issue in the present case is suppression by the State.

In evaluating the suppression of evidence prong, our inquiry is focused on the timing of the disclosure of the evidence at issue. *See Yearby v. State*, 414 Md. 708, 723–24 (2010). "[I]f the defendant learns of the information before the conclusion of trial, to wit, in time to use it, there has been no *Brady* suppression." *Grafton*, 255 Md. App. at 147 (quoting *Adams*, 165 Md. App. at 421–22); *Williams v. State*, 416 Md. 670, 691 (2010) ("The cases are legion, however that [e]vidence *known to the defendant* or his counsel, that is disclosed, even if during trial, is not considered suppressed as the term is used in *Brady*[.]" (internal quotation marks and citation omitted) (emphasis in original)).

Behavior that fails to rise to the level of a *Brady* violation may still be a violation of Maryland's discovery rules. In the absence of a *Brady* violation, "discovery in criminal trials is governed by Maryland Rule 4-263" and, assuming due process requirements are met, the disclosure obligations are "not of a constitutional nature." *Yearby*, 414 Md. at 720 n.8. Maryland Rule 4-263 ("the Rule") mandates the State disclose a wide variety of information to the defense; at issue in the case *sub judice* is the required disclosure of information pertaining to State's witnesses.

The Rule requires the State to disclose the name, address, and if known, telephone number of a witness as well as any "statement in writing that is made, signed, or adopted by that person;" or any material where "the substance of a statement of any kind made by [a witness] is embodied or summarized in a writing or recording, whether or not signed or adopted by the [witness.]" Md. Rule 4-263(b)(6) and (d)(3). Additionally, the State must provide "[a]ll material or information in any form, whether or not admissible, that tends to impeach a State's witness[.]" Md. Rule 4-263(d)(6). The State is required to disclose the

25

required information "within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4-213(c)[.]" Md. Rule 4-263(h)(1).

To ensure compliance with the Rule, "it is within the discretion of the trial court to impose sanctions if the Rule is violated." *Thomas v. State*, 397 Md. 557, 570 (2007). The Rule provides multiple possible sanctions to trial courts for consideration following a discovery violation. *See* Md. Rule 4-263(n). As the Rule states:

> If at any time during the proceedings the court finds that a party has failed to comply with this Rule or an order issued pursuant to this Rule, the court may order that party to permit the discovery of the matters not previously disclosed, strike the testimony to which the undisclosed matter relates, grant a reasonable continuance, prohibit the party from introducing in evidence the matter not disclosed, grant a mistrial, or enter any other order appropriate under the circumstances.

Md. Rule 4-263(n). Notably, the Rule "does not require the court to take any action; it merely authorizes the court to act. Therefore, the presiding judge has the discretion to select an appropriate sanction, but also has the discretion to decide whether any sanction is at all necessary." *Thomas*, 397 Md. at 570.

When a trial court considers whether to impose a sanction for a discovery violation, a primary consideration is whether the violation caused actual prejudice. *See Warrick v. State*, 302 Md. 162, 173 (1985); *State v. Deleon*, 143 Md. App. 645, 669 (2002); *Thomas*, 397 Md. at 570–71. The trial court is also encouraged to consider other factors such as the reason for the failure to disclose, "the feasibility of curing any prejudice with a continuance[,] and any other relevant circumstances." *Thomas*, 397 Md. at 570–71. Ultimately, if sanctions are implemented, "the most accepted view" is that courts "should

impose the least severe sanction that is consistent with the purpose of the discovery rules."
*Id.* at 571. Thus, because the most severe sanction is dismissal of the indictment, it is used only in extreme circumstances. *State v. Graham*, 233 Md. App. 439, 459 (2017).

### 1.     Alleged *Brady* violations

Here, Appellant contends there are two *Brady* violations, the failure to identify additional Cash App payments by Ofc. Dupree as well as the late disclosure of the recorded statement, discussed *supra*. We disagree and conclude neither constitutes a *Brady* violation. As to the State's failure to identify Ofc. Dupree's additional payments to K.T., we conclude that the conduct, or lack thereof, does not constitute a *Brady* violation because the payments were not suppressed under the meaning of *Brady*. *Yearby*, 414 Md. at 722. Appellant's counsel discovered the separate account payments through an additional investigation prior to trial. In fact, during cross-examination, Appellant effectively impeached K.T's credibility by introducing the additional payments made by Ofc. Dupree after K.T. testified that she received only one payment from Ofc. Dupree. *See Williams,* 416 Md. at 691 (noting that evidence is not suppressed within the meaning of *Brady* when the defense acquires the evidence in time for its use at trial).

Similarly, the late disclosure of K.T.'s recorded statement to Det. Savoy does not qualify as a *Brady* violation. *See Grafton*, 255 Md. App. at 147. While the recorded statement was not provided to Appellant until K.T. was being examined on the stand, Appellant was made aware of the existence of the statement in other discovery and ultimately received the statement prior to the close of trial. Appellant was provided time to review the statement and an opportunity to recall K.T. for additional cross-examination the

27

following day. Thus, Appellant was provided the opportunity to both prepare and use the statement at trial. Consequently, we agree with the State that no *Brady* violations occurred in this case.

### 2. *Discovery violations*

As to the contended discovery violations, we begin by addressing the State's failure to properly identify a witness during the discovery process. In the days leading up to trial, the court was notified of the State's violation of Rule 4-263 when Appellant informed the court that the name of a witness had not previously been disclosed. Pursuant to Rule 4-263 the State was required to disclose the witness's name, address, and if known, the telephone number to Appellant; yet, until the time the State submitted its *Voir Dire* containing its witness list, the witness had only been identified as K.T.'s aunt who would serve as a "prompt report" witness, testifying that K.T. informed her of the incident shortly after it occurred.

As a result of the State's failure to properly identify the name of the witness, the court precluded the witness, K.T.'s aunt, from testifying on behalf of the State. In doing so, we conclude the court properly exercised its discretion. The court explained when issuing the ruling, that by failing to properly identify the witness, Appellant was prevented from preparing for the aunt's testimony because he could not conduct a search of the aunt's background. We agree with the trial court that in failing to timely identify the witness in accordance with Rule 4-263, the State violated the discovery rules. Moreover, the court's sanction was reasonable when considered in relation to the discovery rules, which serve the purpose of "assist[ing] the defendant in preparing a defense and . . . protect[ing] the

28

defendant from surprise." *Thomas*, 397 Md. at 567. By precluding the witness from testifying, the court crafted an appropriate remedy that cured any potential prejudice. *See, e.g., Breakfield v. State*, 195 Md. App. 377, 387–91 (2010) (holding that the court did not abuse its discretion when it prevented three defense witnesses from testifying as a sanction for failing to disclose the witnesses until trial).

Turning to K.T.'s recorded statement, the State concedes that the failure to disclose K.T.'s recorded statement to Det. Savoy prior to trial "is indisputably a discovery violation[.]" At trial, the State explained that there was miscommunication and confusion which resulted in the late disclosure of the transcript. The State indicated it believed the recorded statement had been shared with Appellant and later learned that was not the case. It was during an interaction at trial when the State shared additional notes from the recorded statement with Appellant's counsel and Appellant's counsel began cross checking the notes with the transcripts in his possession, that the State realized Appellant did not have possession of the transcript or audio recording for that particular statement. When ruling, the court noted that the violation occurred even though the recorded interview was mentioned in the discovery that had been properly provided, which would have placed both parties on notice of the statement. Hence, there is nothing apparent in the record that the State's violation was willful.

The court addressed the other considerations, related to prejudice and the feasibility of curing any prejudice, when it explained its findings and outlined a remedy.

> I don't find this case has gone to verdict and that that information would have changed the outcome of the verdict. We're not there. So what I'm saying is I'm willing to give you time to look over that. Because from what I'm hearing

29

just kind of on the surface, there are some nuances, maybe some changes, but I'm not hearing anything that would be a 360 or a 180 from what she testified.

***

Again, we're at what is the remedy. The remedy is in the [c]ourt's discretion. I don't find that this rises to the level of a dismissal with prejudice and I've denied it. However, I am willing to stop now . . . , allow you time to review the statement. I will order that the witness be called back and you're allowed to cross-examine her on that statement. I'm going to give you a moment to think about that and discuss it with your client.

Ultimately, the court issued the remedy as stated, allowing an additional witness to briefly be called before adjourning early for the day and delaying the start of trial the next day to allow the defense time to review the transcript.

Based on the trial court's reasoning, we cannot find that the decision to recess for the day and re-call the witness for additional cross-examination was removed from the center mark such that it would constitute an abuse of discretion. *Sindler v. Litman*, 166 Md. App. 90, 123 (2005) ("[T]o be reversed '[t]he decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable.'") (quoting *Wilson v. Crane,* 385 Md. 185, 198–99 (2005)).

The trial court heard detailed explanations from both parties addressing the contents of the transcript and the reason for its late disclosure before determining a sanction. The court also specifically addressed considerations outlined by the Supreme Court of Maryland for fashioning a remedy, noting that the interview contents did not substantively stray from the testimony K.T. had already provided and that had the trial gone to verdict, the information would not have changed the outcome. *See Thomas*, 397 Md. at 570–71

30

(stating a trial court should consider "the existence and amount of any prejudice to the opposing party").

Thus, by recessing for the day and recalling K.T. to the witness stand the following day, the court provided a sufficient remedy to cure any prejudice that may have resulted from the late disclosure of the statement. Furthermore, it was not unreasonable for the court to consider that the State's confusion and not willfulness led to the late disclosure of the material. *See Thomas*, 397 Md. at 570 (noting that one of the trial court's considerations when fashioning a sanction should be "the reasons why the disclosure was not made").

### 3. Motion to dismiss

Turning to the motion to dismiss based on the totality of the contended violations, Appellant's trial counsel argued that the cumulative effect of the late disclosures, the lack of disclosure of the secondary Cash App account payments, and the playing of irrelevant and potentially prejudicial voice messages required a dismissal of the indictment. After hearing both sides on the issue for a second time, the court held: "As it relates to the dismissal, again, I don't find this is a case where any prejudice cannot be cured. I don't find this rises to the level of the extreme. Although the [c]ourt has discretion, I don't find that this rises to the level of a dismissal." The court then denied the request to vacate the denial of the motion to dismiss.

We conclude that the trial court did not abuse its discretion in denying the motion to dismiss. The trial court reasonably exercised its discretion in addressing each incident that Appellant highlighted during his motion, providing remedies tailored to each incident

31

per its discretion, as discussed *supra*.[13] The only conduct the court did not address individually was the failure on the part of the State to identify the additional Cash App payments sent to an account of K.T.'s which differed from the account previously disclosed by the State to Appellant. The separate Cash App account was identified by defense counsel prior to trial and the State did not become aware of its existence until *Appellant* introduced the additional payments during cross examination. By the time the trial court learned of the conduct, Appellant had already used the additional Cash App payments to impeach K.T. in front of the jury. Thus, there was no prejudice left for the trial court to remedy. *See Deleon*, 143 Md. App. at 669 (noting that "appellate courts require an evaluation of whether actual prejudice occurred in fashioning an appropriate remedy[.]").

Having determined that the court did not abuse its discretion when considering each act individually, we also conclude it did not abuse its discretion when considering the circumstances and the court's rulings in total.[14] Thus, the trial court's decisions and

---

[13] We note that the trial court asked Appellant if he would like to move for a mistrial on multiple occasions, a sanction less extreme than dismissal of the indictment, and Appellant declined to raise such a motion.

[14] Appellant also asserted that the prejudicial and irrelevant playing of WhatsApp messages contributed to his denial of a fair trial. After reviewing all the other instances of alleged conduct, we cannot conclude that the act of playing a message that referenced Appellant's interest in "hooking up" with a woman who was not K.T. and the mention of Bill Cosby in another message would have tipped the scales, resulting in a finding that the trial court abused its discretion when it denied the motion to dismiss. Upon the messages being played in court, the trial court instructed the jury to disregard the mention of Bill Cosby and Appellant's interest in "hooking up" with another woman, in addition to having the State redact the messages for the jury's use during deliberation. This action was well within the discretion of the trial court and does not on its own require the dismissal of the indictment. *See Graham*, 233 Md. App. at 459.

remedies in response to the State's conduct were aligned with the facts and logic of the

case and therefore, we conclude the court did not err when it denied the motion to dismiss.

*See Sindler*, 166 Md. App. at 123.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

The correction notice(s) for this opinion(s) can be found here:

https://www.mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0047s23cn.pdf